UNITED STATES of America, Appellee,

v.

Ralph J. CORACE, Defendant–Appellant.

Docket No. 97–1437.

United States Court of Appeals, Second Circuit.

Argued March 3, 1998.

Decided May 20, 1998.

William J. Cunningham, Meyer, Suozzi, English & Klein, Mineola, NY, for defendant-appellant.

Joseph R. Conway, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Emily Berger, Asst. U.S. Atty., Brooklyn, NY, on brief), for appellee.

Before: NEWMAN, CABRANES and MERRITT,* Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal principally concerns a sentencing judge's authority to fine a defendant whom the presentence report ("PSR") states is unable to pay a fine in addition to a substantial amount of restitution. Ralph J.

Corace appeals from the July 11, 1997, judgment of the District Court for the Eastern District of New York (Leonard D. Wexler, Judge), convicting him, upon his guilty plea, of theft from an employee benefit plan in violation of 18 U.S.C. § 664 (1994). The Court imposed a sentence that included 37 months' imprisonment and a $60,000 fine.

Although we affirm the judgment of the District Court in most respects, we remand for reconsideration of the imposition of the fine and for the additional purpose of modifying the judgment to reflect corrections in the PSR.

### Background

Corace was the president and sole shareholder of Job Shop Technical Services, Inc. ("Job Shop"), a firm that contracted with companies in the aerospace industry to supply engineers for temporary assignments. Corace was also the trustee of Job Shop's pension plan (the "Plan"). Beginning in 1992, Job Shop suffered significant operating losses. From December 1992 until the sale of Job Shop's assets in November 1994, Job Shop, apparently at Corace's direction, continued to withhold funds from employees' payroll checks, purportedly for the purpose of depositing the sums in the Plan, but failed to remit these funds. Instead, Corace used these funds—totalling $2.3 million—to meet Job Shop's operating expenses, and recorded on its books a corresponding current liability to the Plan.

Beginning in 1994, Corace entered into negotiations with Consolidated Technology Group, Ltd., and its wholly-owned subsidiary, I.T.S. Management Corp. (collectively, "Consolidated"), for the sale of Job Shop. In May 1994, the parties tentatively agreed that Consolidated would acquire Job Shop's assets; in exchange, Consolidated would satisfy Job Shop's outstanding tax liability of approximately $2 million and would repay the amount that Job Shop had secretly "borrowed" from the Plan. However, negotiations collapsed before the agreement was finalized.

---

* The Honorable Gilbert S. Merritt of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

In November 1994, Job Shop and Consolidated finally agreed to a sale on somewhat different terms. As before, Consolidated would acquire all of Job Shop's assets and would pay Job Shop's outstanding tax debt. But rather than replenishing the misused Plan funds, Consolidated would transfer 1.5 million shares of restricted Consolidated common stock; the record does not disclose whether title to the stock was to be held by Job Shop or by Corace personally.

After the November 1994 asset sale, it appears that Job Shop ceased doing business. However, the Plan continued to function, and Corace continued to serve as its trustee. At some point in 1995, the Secretary of Labor brought an action against Corace, Job Shop, and the Plan, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover assets for the Plan. In November 1995, Corace resigned as trustee, and pursuant to a stipulation of the parties, an independent trustee, John Braslow, Esq., was named by the Court.

In June 1996, Corace was charged with one count of theft from an employee benefit plan, in violation of 18 U.S.C. § 664, and pled guilty, pursuant to an agreement with the Government. The plea agreement predicted an adjusted offense level of 15, but stated that this prediction was not binding on the court. Corace retained the right to seek a downward departure.

Although the plea agreement does not explicitly refer to the amount of loss, the parties agree that the projected 15–point adjusted offense level included a 10–level enhancement, to reflect a stipulated $225,000 loss. This figure was calculated through an attempt to reconstruct the loss to the Plan as of November 21, 1994, the day Corace sold Job Shop's assets to Consolidated. The parties began with the $2.3 million in employee deductions that Corace had failed to pay to the Plan by November 21. They then reduced that figure by the $200,000 in payroll deductions that ·Corace

had failed to remit during the 90 days prior to November 21, on their assumption, not disputed on appeal, that ERISA allows a 90–day grace period between the deduction of employee contributions and their deposit into a plan. *See* 29 C.F.R. § 2510.3–102(c) (1997). Most significantly, the parties agreed that the gross loss should be further reduced by $1.875 million, to reflect the value of the Consolidated stock as of November 1994 (1.5 million shares × $1.25, the market price of publicly traded shares on November 21, 1994 = $1.875 million).

In the PSR, however, the Probation Department calculated a higher loss. It determined, erroneously, that Corace had failed to remit $2.7 million in employee contributions. Additionally, it refused to give the defendant an offset for the value of the Consolidated stock. Accordingly, the PSR recommended a 15–level enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(P) (1997) (15–level enhancement for losses greater than $2.5 million but less than $5 million).

At the sentencing hearing, the Court heard both parties' objections to the PSR and accepted a number of the requested revisions. Among other things, the Court agreed to correct the PSR to reflect that Corace failed to remit $2.3 million rather than $2.7 million to the Plan.[1] Additionally, the Court made a number of rulings relevant to this appeal.

First, the Court heard argument on the amount of loss, whereupon both parties adhered to the agreed upon $225,000 loss and the corresponding 10–level enhancement. The Court ruled, however, that a 14–level enhancement—for a loss of between $1.5 million and $2.5 million, *see* U.S.S.G. § 2B1.1(b)(1)(O)—should apply. Although the Court did not take a position on the propriety of granting a $200,000 deduction for the 90–day depository grace period, it rejected the $1.875 million offset as substantially inflated. Over defense counsel's objections, the Court ruled that the Consolidated stock (i) was restricted stock, and thus would not have been worth the $1.25 per share

---

1. The District Court and the parties agreed that the Probation Department had derived the $2.7 million loss figure from Corace's consent judgment in the parallel civil action. They further

agreed that this judgment included $400,000 in prejudgment interest that should not have been included in the loss for sentencing purposes.

value of unrestricted stock on November 21, 1994, and (ii) in any event, had been held in escrow, pursuant to an agreement to which Corace was a party, and would not be released to the Plan trustee until immediately after sentencing.

In making its own determination of the stock's value, the Court relied on a letter written by a representative of Smith Barney and submitted to the Court by the Plan's court-appointed trustee, Mr. Braslow. That letter, written two days prior to sentencing, documented a then-current selling price of $0.0625 per share for publicly-traded Consolidated stock. The Court reasoned that it was sensible to use this figure in order to determine the value that the Consolidated stock would have to the Plan. Accordingly, the Court offset the gross loss by $93,750 (1.5 million shares × $0.0625 = $93,750). The Court noted that even if this valuation were low by a factor of two, a $200,000 offset still would not reduce the net loss below the $1.5 million floor for a 14–level enhancement.

Second, immediately before pronouncing sentence, the Court denied the defendant's various motions for a downward departure. In rejecting Corace's appeal for leniency, the Court stated the following:

> The Court is obviously annoyed with this case. 476 people got hurt, maybe a white collar crime, maybe no crime of violence[.][Y]ou may have had the best of intentions, but you never checked with them. 476 people are hurt.
>
> They write letters, there's phone calls by them, what's happening. They can't recoup this matter ever. They can't recoup it. They don't know what's happening with their lives.
>
> They don't come in because they're scattered all over the United States. But they write, they call, they were hurt. You hurt them, even though you may not have intended. I cannot give you lenience. I'm annoyed.

In a subsequent hearing on bail pending appeal, Judge Wexler explained that he had not spoken personally with any of the victims. Rather, he had spoken by telephone to the court-appointed trustee, Braslow, who had represented to him that there were 476

victims and that they were "curious and hurt and wanted to know what was going on." Additionally, Judge Wexler explained that he had received a letter from one of the victims, but had not read it; instead, he had directed his secretary to place the letter in a sealed envelope.

Ultimately, the Judge imposed a sentence of 37 months' imprisonment (the upper limit of the applicable 30–37 month range); he also imposed a $60,000 fine, even though the PSR had concluded that Corace "appears unable to pay a fine in addition to restitution." *See* PSR ¶ 47. The Court made no inquiry nor any findings as to Corace's ability to pay a fine.

### Discussion

#### 1. *Ex Parte* Communications

Corace argues that the District Court impermissibly relied on *ex parte* communications, without disclosing their contents to the defendant and giving him an opportunity to respond. Corace contends that he was thereby denied due process.

This Court has held that a criminal defendant has a right to have notice of, and an opportunity to respond to, *ex parte* communications that will bear on sentencing. *See United States v. Louis*, 814 F.2d 852, 858 (2d Cir.1987) (sentence vacated because of undisclosed *ex parte* communication with foreign judicial officer concerning penalties abroad); *cf. United States v. Harris*, 38 F.3d 95, 97–98 (2d Cir.1994) (sentence affirmed where sentencing postponed to permit defendant to respond to letters from crime victims urging stiff penalties). We have emphasized the potential unfairness that inheres in the sentencing judge's reliance on false or misleading factual representations that a defendant has not been given an opportunity to challenge. *See Louis*, 814 F.2d at 858.

To establish the sort of prejudice that would justify reversal, Corace would have to show that the *ex parte* communications contained some inaccuracy on which the sentencing court might have relied. *See Harris*, 38 F.3d at 98; *Louis*, 814 F.2d at 858. Corace appears to accept Judge Wex-

ler's post-sentencing clarification, in which the Judge explained that he had spoken only with the court-appointed Plan trustee, and that the information conveyed to him was limited to the numbers of victims and the fact that some had called the trustee to express anger and confusion. Corace does not contend that Judge Wexler was misled about either the number of victims or their emotional responses to the crime.

■ We continue to adhere to our view that it is generally advisable to give defendants advance notice of any *ex parte* communication that may bear on the sentencing determination. But where, as here, the defendant challenges only the court's failure to give such notice—but neither the facts contained in the communication nor any factual inferences to be drawn from it—reversal is not warranted.

2. Valuation of Loss

■ Corace contends that in calculating the amount of loss for sentencing purposes, the Court erroneously undervalued the offset to which he was entitled for the Consolidated stock by estimating its market price as of the wrong date. Regardless of the valuation date, however, his argument is unavailing because he would not be entitled to any offset for the value of the stock, even if it were held for the purpose of repaying the Plan. For purposes of a sentencing loss calculation, a thief or an embezzler has no right to claim an offset for the value of monies returned to the victim between the initial wrongdoing and the time of detection. *See, e.g., United States v. Arjoon*, 964 F.2d 167, 171–72 (2d Cir.1992).

■ Corace might be understood to be arguing that he invested the Plan's money in the Consolidated stock, and thus this stock represented value to the Plan that should be deducted from the gross loss figure. This argument is unavailing for at least two reasons. First, there is no indication in the record that Corace had Consolidated transfer the stock to the Plan; rather, it appears that the stock may have been transferred either to Job Shop or to Corace personally as part of the sale of Job Shop's assets. Second, even if Corace had arranged for the stock to be transferred to the Plan upon the asset sale in November 1994, the thefts to which he pled guilty occurred prior to this date. Accordingly, his efforts represent at most an attempt to repay the Plan for a loss already caused by his criminal misappropriation, rather than a contemporaneous transfer that might be seen as reducing the amount of the loss.

Though Corace is not entitled to any offset for the value of the Consolidated stock, regardless of how that value might properly be calculated, he would still be subject to a 14-level enhancement of his base offense level, with or without the offset applied by Judge Wexler. Corace would not be subject to a greater sentence because the full loss of $2.3 million still falls within the range designated by the Guidelines for a 14-level enhancement ($1.5 million to $2.5 million).

3. Imposition of a Fine

Appellant challenges the imposition of the $60,000 fine. He contends that it was improper to impose a fine after the PSR stated that he "appears unable to pay a fine in addition to restitution." PSR, ¶ 47. Though the judgment in the criminal case contained no provision for restitution, Corace had previously signed a consent judgment in a civil suit, brought by the Secretary of Labor, which made Corace and Job Shop jointly and severally liable to the Plan for $2.3 million plus $400,000 of interest.

The principles governing imposition of a fine are set forth in the applicable statutes, the Sentencing Guidelines, and the case law of this Circuit. Congress has stated that "[a] defendant who has been found guilty of an offense *may* be sentenced to pay a fine," 18 U.S.C. § 3571 (emphasis added), and has specified several factors to be considered "[i]n determining *whether* to impose a fine," including "the defendant's income, earning capacity, and financial resources," "any pecuniary loss inflicted upon others," and "whether restitution is ordered," *id.* § 3572(a)(1), (3), (4) (emphasis added). Congress has also provided that "[i]f, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other

than the United States, the court shall impose a fine ... only to the extent that such fine ... will not impair the ability of the defendant to make restitution." *Id.* § 3572(b) (1994 & Supp. II 1996). The Sentencing Guidelines state that "[t]he court *shall* impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added). Similar to the governing statute, the Guidelines specify relevant considerations, including the defendant's ability to pay and any restitution the defendant is obligated to make, *id.* § 5E1.2(d)(2), (4), but the Guidelines make the considerations relevant only to the amount of the fine, rather than the decision whether to impose a fine, *id.* § 5E1.2(d). This difference in wording between the statute and the Guidelines is minimized, however, by an application note explaining that "[t]he determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay any fine." *Id.* § 5E1.2, comment. (n.3). The Guidelines do not explicitly convey the statutory command that a sentencing court shall impose a fine "only to the extent that such fine ... will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b).

■ Our case law has recognized that the defendant bears the burden to show indigence that will avoid imposition of a fine, *see United States v. Puello,* 21 F.3d 7, 11 (2d Cir.1994); *United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991), but we have also observed that once indigence has been shown, "the discretion vested in sentencing courts ... to waive a fine ... should generally be executed in favor of such a waiver," *United States v. Wong,* 40 F.3d 1347, 1383 (2d Cir.1994). Although present indigence is not an absolute barrier to the imposition of a fine, *see United States v. Workman,* 110 F.3d 915, 918 (2d Cir.1997), a fine may be imposed on a currently indigent defendant only if there is " 'evidence in the record that he will have the earning capacity to pay the fine after release from prison,' " *Wong,* 40 F.3d at 1382 (quoting *United States v. Rivera,* 971 F.2d 876, 895 (2d Cir.1992)). Speculation that an indigent defendant might win the

lottery will not suffice. *See Wong,* 40 F.3d at 1382–83.

*Marquez* and especially the later decision in *United States v. Stevens,* 985 F.2d 1175 (2d Cir.1993), also established that the sentencing judge must afford the defendant an opportunity to present evidence of his financial inability to pay a fine. We had previously held that a defendant may satisfy his burden "by an independent showing, or by reference to his presentence report." *United States v. Rivera,* 971 F.2d at 895; *see United States v. Rivera,* 22 F.3d 430, 440 (2d Cir.1994). Objective evidence of inability to pay, such as representation by assigned counsel, will obviously strengthen a defendant's claim of financial inability. *See Stevens,* 985 F.2d at 1188; U.S.S.G. § 5E1.2, comment. (n.3).

Beyond the issue of whether to impose a fine, our case law has also considered the question of whether a judge must articulate reasons for imposing a fine. In *Marquez,* we ruled that although a sentencing judge is obliged by the statute to "consider ... the defendant's income, earning capacity, and financial resources," 18 U.S.C. § 3572(a)(1), this provision "imposes no separate requirement that this consideration be articulated." *Marquez,* 941 F.2d at 65. And, in the general run of cases, we have not required the sentencing judge to say anything specifically about the appropriateness of a fine, beyond the general mandate of 18 U.S.C. § 3553(c), which requires the sentencing court to "state in open court the reasons for its imposition of the particular sentence." *See id.*

■ The applicable standards frame two issues concerning the imposition of a fine upon Corace—what significance should be attached to the restitution requirement of the consent judgment in the Secretary of Labor's civil suit and how the sentencing judge should proceed when the PSR reports current indigence. Although Corace's restitution obligation was not technically imposed "as a result of a conviction," 18 U.S.C. § 3572(b), if that phrase contemplates restitution as a component of the sentence rather than of a judgment in a related civil proceeding, in the circumstances of this case that

obligation was the functional equivalent of a restitution requirement included in a sentence. Corace became obligated to make restitution as a result of a lawsuit brought by the Secretary of Labor. Whether the United States enforces restitution to crime victims as part of a civil lawsuit or a criminal sentence, the sentencing court must be careful not to jeopardize the prospects of restitution and may impose a fine "only to the extent that such fine ... will not impair the ability of the defendant to make restitution." *Id.*

 In the pending case, the PSR concluded that Corace was unable to pay a fine. Despite the fact that the defendant was represented by retained counsel, significant corroboration of his financial inability to pay a fine was provided by his financial statement, particularly by his obligation to make restitution of $2.7 million to his victims. Though a sentencing judge is not bound by the recommendation of the PSR, *see United States v. Miller,* 116 F.3d 641, 685 (2d Cir.1997), the circumstances of this case bearing on inability to pay were sufficient to oblige the Court, before imposing a fine, to indicate the basis for the Court's implicit conclusion that the defendant could realistically be expected to pay a fine and could do so in an amount that would not impair his ability to make restitution. In the absence of such explication, the case must be remanded for reconsideration of the fine.

4. Amendments to the PSR

Corace and the Government agree that after the District Court ruled on Corace's objections to the PSR, and corrected it in certain respects, the Court did not formally append a copy of its determinations to the PSR. Moreover, the Judgment states that the Court "adopts the factual findings and guideline application in the presentence report" without noting any of these corrections. The parties agree that a remand is necessary so that the Court can append its determinations and corrections to the PSR, and thus cure the technical violation of Fed.R.Crim.P. 32(c)(1) ("A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons.").

Conclusion

We affirm the judgment of the District Court, except that we remand for the limited purpose of reconsidering the imposition of a fine and for modifying the judgment to reflect corrections to the PSR.