186 F.3d 149 (2nd Cir. 1999)
 UNITED STATES OF AMERICA, APPELLEE,
v.
MAHIR REISS, ALSO KNOWN AS BARBITAS, ALSO KNOWN AS BARBAS, ALSO KNOWN AS UNCLE, ALSO KNOWN AS THE RABBI, DEFENDANT-APPELLANT,
ABRAHAM REISS, BERNARD GRUNFELD, JACK PINSKI, ROBERTO BUENDIA, FABIO ARANA, LISANDRO MONTES DE OCA, FRANCISCO GIL, ESTONIO RODRIGUEZ, JUAN SUAREZ, ALVARO DUQUE, AND ISRAEL KNOBLOCH, DEFENDANTS.
 Docket Nos. 98-1468 & 98-1441
 U.S. Court of Appeals, Second Circuit
 Argued: March 17, 1999
Decided May 27, 1999
 
 Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Llp, Washington, D.c. (Richard W. Garnett IV, on the brief), for Defendant-Appellant.
 Lee G. Dunst, Assistant United States Attorney for the Eastern District of New York, (Zachary W. Carter, United States Attorney, and Peter A. Norling, Assistant United States Attorney, on the brief), for Appellee.
 Before: Walker and Cabranes, Circuit Judges, and Tsoucalas, Judge.*
 
 Tsoucalas, Judge
 
 1
 Defendant-appellant Mahir Reiss appeals from his sentence imposed by the United States District Court for the Eastern District of New York (Jack B. Weinstein, Judge) following his plea of guilty to a money-laundering charge. Specifically, Reiss claims that the district court erred in its calculation and imposition of a $ 6.3 million fine. Reiss further argues that he is entitled to be resentenced pursuant to Fed. R. Crim. P. 35 because of an alleged Fed. R. Crim P. 32 violation during sentencing.
 
 
 2
 We affirm.
 
 Background
 
 3
 Reiss, a sophisticated businessman, used Swiss bank accounts to pool vast sums of money from around the world. Under Reiss' direction, funds were wired into his accounts from accounts in a number of foreign countries and immediately sent out again to international locations. More than $ 16 million was deposited into his accounts and more than $ 19 million was subsequently withdrawn between 1994 and 1997. An investigation by the Drug Enforcement Ajuristration ("DEA") and the Internal Revenue Service ("IRS") revealed that some of these funds were the proceeds of criminal activity.
 
 
 4
 On December 22, 1997, Reiss pleaded guilty to a one-count superseding information that charged him with conspiring to engage in monetary transactions in criminally derived property (derived, in fact, from narcotics trafficking) in excess of $ 10,000 from August 1994 through April 1996 in violation of 18 U.S.C. 1956(h) and 1957(a). The district court sentenced Reiss to a term of 27 months imprisonment, three years supervised release, joint forfeiture with his co-defendant of $ 1,000,000, a special assessment of $ 50, and the maximum statutory fine under the court's calculations of $ 6.3 million.
 
 
 5
 There are three business transactions relevant to the imposition of Reiss' fine. The district court applied the sum of $ 750,000 from the first two transactions to the $ 2.4 million involved in the third transaction to calculate the fine imposed. Reiss does not challenge the use of the two transactions totaling $ 750,000 in determining the fine. The inclusion of the third transaction, which involves the sale of an airplane, is at issue here.
 
 
 6
 Reiss claims that the government failed to establish that any of the funds used in the airplane transaction were criminally derived property under 1957. In the alternative, Reiss argues that even if part of the funds were criminally derived, the fine imposed cannot be based on the total amount of money used in the airplane transaction. Reiss further asserts that even if drug money were involved in the transaction, the fine imposed was erroneous because he had no knowledge that drug proceeds were being used to purchase the airplane. Finally, Reiss contends that the district court did not develop a sufficient record justifying its decision and failed to consider Reiss' ability to pay the fine imposed along with other enumerated factors as required by the Sentencing Guidelines.
 
 
 7
 Apart from appealing the calculation of the fine, Reiss argues that he is entitled to be resentenced pursuant to Fed. R. Crim. P. 32(c)(1) and 35 because substantial changes were allegedly made to the pre-sentence report ("PSR") after his sentence was imposed.
 
 Discussion
 A. The Calculation of the Fine
 
 8
 Section 1957, the money-laundering statute to which Reiss pleaded guilty, provides in relevant part:
 
 
 9
 (a) Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).
 
 
 10
 (b)(1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both.
 
 
 11
 (2) The court may impose an alternate fine . . . of not more than twice the amount of the criminally derived property involved in the transaction.
 
 
 12
 . . .
 
 
 13
 (f) As used in this section
 
 
 14
 . . .
 
 
 15
 (2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and
 
 
 16
 (3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title [which includes narcotics trafficking].
 
 
 17
 18 U.S.C. 1957 (emphasis added).
 
 
 18
 Judge Weinstein calculated Reiss' offense level on the basis of all three money laundering transactions which involved, in total, $ 3,150,000. The court therefore doubled the amount of money found to be criminally derived, as the statute permits, to determine the $ 6.3 million fine.[1]
 
 1. Proof of Criminally Derived Property
 
 19
 Although Reiss concedes that the $ 750,000 he laundered in the winter of 1995 and in the spring of 1996 were criminally derived proceeds, he argues that the government failed to establish that any of the money passed through his Swiss bank account to purchase an aircraft for Colombian buyers was criminally derived property. In the alternative, Reiss argues that, even if part of the $ 2.4 million were drug proceeds, the fine may not be based on the entire amount of money involved in the airplane transaction.
 
 
 20
 Reiss' argument that the government failed to prove that the funds used to purchase the airplane were actually criminally derived has no merit. The district court found that the government demonstrated that the aircraft transaction involved proceeds of narcotics trafficking and that, in particular, the $ 2.4 million was drug money. We review such findings of fact by the district court for clear error. We find no error here.
 
 
 21
 The record strongly supports the district court's conclusion that the $ 2.4 million in laundered funds were drug proceeds. Reiss' scheme concerning the airplane purchase required many convoluted steps, a ruse that is characteristic of similar dealings with drug traffickers. The main events in his money-laundering operation involving the airplane purchase were as follows: In September and October 1994, Reiss, with the help of officials at Steger Trust, a private bank in Switzerland where he held several accounts, established Aero Marketing, a Liberian front company domiciled in Switzerland, for the sole purpose of buying the airplane. Aero Marketing shared a mailing address with Steger Trust and had as its only director a Liechtenstein-based functionary. Steger Trust officials were the original owners of the company, but the ownership certificates were transferred to a friend of Reiss'. Reiss had Steger Trust create an account for Aero Marketing, for which the bank deducted $ 20,000 in fees from Reiss' accounts.
 
 
 22
 As counsel for the airplane purchase, Reiss selected another friend, a New York litigator with no experience in the purchase or sale of airplanes. On October 11, 1994, Reiss' attorney wrote to Jack Pinski, whom Reiss had identified as Aero Marketing's representative in Bogota, Colombia, and to Reiss in Brooklyn, suggesting the use of an escrow account for the airplane transaction. On October 24, 1994, Pinski responded via fax to Reiss regarding the payment terms for the aircraft, specifying that the funds were to be wired to an escrow account in Oklahoma City, Oklahoma before the airplane would be sent to the buyers in Colombia. According to Pinski's fax, a company called Aeromar Ltd. would be leasing the plane; however, when DEA agents investigated Aeromar's address, they discovered it was located in a depressed section of Bogota and housed a dentist's office, not Aeromar. Pinski's fax used the word "gadget" rather than words such as "plane" or "aircraft."
 
 
 23
 Reiss was responsible for coordinating payment for the aircraft. Under the terms of the purchase contract, $ 2.4 million of the $ 2.8 million purchase price would be transferred to an escrow account. To effect this transfer, first $ 2,531,955 was sent to Chi Tat Investment Ltd., one of Reiss' Steger Trust accounts, in twelve separate wire transfers between October 4, 1994 and November 5, 1994 from at least six accounts in Switzerland, Brooklyn, and Israel. Following the consolidation of funds in the Chi Tat account, Reiss transferred the funds to the Aero Marketing account, and, in early November 1994, he had $ 2.4 million sent by wire transfer from the Aero Marketing account to the Oklahoma City escrow set up by Pinski. Once the $ 2.4 million was transferred to the Oklahoma account, the plane was delivered to its Colombian buyers in Bogota.
 
 
 24
 A Colombian narcotics trafficker identified in the record only as "Orlando," with whom Reiss had had previous dealings, was involved with the 1994 purchase of the airplane. Apparently, a confidential informant and DEA and IRS agents identified Orlando as being heavily involved in narcotics trafficking and money laundering the in United States. It can be inferred from intercepted phone calls and facsimile transmissions in 1995 that Orlando was involved in the airplane transaction and that he knew Reiss was also involved.
 
 
 25
 Considering the above facts in the record, we uphold the district court's determination that the entire amount of the funds involved in the purchase of the airplane was criminally derived. We reject Reiss' argument that the district court erroneously based the fine on the entire amount used to purchase the airplane after purportedly finding that only a portion of the money was criminally derived. Reiss simply mischaracterizes the district court's conclusion. Contrary to Reiss' position, the district court found that all the funds laundered were criminally derived. Only in the context of a hypothetical did the district court mention that the fine would be the same even if only part of the funds were tainted. The court explained as follows:
 
 
 26
 Even if what you say is true, that is, that [Reiss'] share of the transaction wasn't illegally-derived and I find that it was illegally-derived, even if I were wrong, the total purchase was poisoned by the million dollars that was needed to complete it.
 
 
 27
 If you're buying a boat for a million dollars and somebody says, I've got five hundred thousand properly-derived, I need five-hundred thousand illegally-derived, the boat is illegally-derived, the whole million.
 
 
 28
 Tr. at 40 (July 13, 1998) In light of the court's finding that all of the funds were criminally derived, we need not reach the question of whether the sentence imposed would have been appropriate had the district court found that only a portion of the funds involved in the transaction was criminally derived. This hypothetical question is not before the Court in light of the district court's finding that all the funds were criminally derived.
 
 2. Knowledge of Drug-Relatedness
 
 29
 In the PSR, the probation department recommended upward adjustments to Reiss' offense level pursuant to U.S.S.G. 2S1.2[2] to reflect Reiss' knowledge that he was laundering proceeds of narcotics trafficking. During the sentencing hearing on July 1, 1998, the district court declined to apply the enhancement, holding that:
 
 
 30
 Although the preponderance of the evidence supports a finding that the defendant knew that these were drug-related funds, that is, that it is more probable than not that he did know he was assisting drug traffickers in this international drug trade, the evidence does not support a finding by clear and convincing evidence, which I believe is required in a case like this. Therefore, I am going to find no drug-relatedness-knowledge.
 
 
 31
 I will, however, continue, as I indicated yesterday, to find, because on this point the evidence seems to be overwhelming, that the airplane transaction was connected to this series of other transactions . . . for purposes of the guidelines.
 
 
 32
 Tr. at 143 (June 30, 1998).
 
 
 33
 Reiss argues that the court's imposition of the fine is inconsistent with its finding that the government did not prove by clear and convincing evidence that Reiss knew of the drug source of the funds. Therefore he argues that the fine was inappropriate. This argument has no merit.
 
 
 34
 First, the specific requirements of 1957 and U.S.S.G. 2S1.2 are different. In a prosecution for an offense under 1957, "the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. 1957(c). Rather, the defendant need only know that the funds were criminally derived. To apply a five-level enhancement under U.S.S.G. 2S1.2 (b)(1), on the other hand, the defendant's knowledge or belief that he is dealing with drug proceeds is required.
 
 
 35
 Second, in the course of deciding whether to enhance Reiss' sentence under U.S.S.G. 2S1.2, the district court specifically stated that it was "more probable than not" that Reiss knew the funds used to purchase the airplane were drug-related. Although the district court went on to apply a clear and convincing evidence standard to the 2S1.2 enhancement,[3] there is no reason to believe that the district court used anything other than a preponderance-of-the-evidence standard in deciding that the $ 2.4 million used in the airplane purchase could be used in calculating Reiss' fine under 18 U.S.C. 1957. See, e.g., United States v. Franklyn, 157 F.3d 90, 97 (2d Cir. 1998) ("Disputed facts relevant to sentencing must be established by a preponderance of the evidence, and the sentencing court may rely upon any information known to it."). Accordingly, the district court's ruling on the 2S1.2 enhancement does not undermine its separate determination that the money used in the airplane transaction was criminally derived property for the purpose of calculating Reiss' fine.
 
 
 36
 3. Imposition of the Fine under the Sentencing Guidelines
 
 
 37
 The district court sentenced Reiss to a term of 27 months imprisonment and a fine of $ 6.3 million.[4] Reiss argues that the court failed to consider the factors required by the Guidelines and by statute in imposing the fine. The record reveals that this contention is without merit.
 
 
 38
 A district court must consider the factors enumerated in U.S.S.G. 5E1.2(d) in determining the appropriate fine. See United States v. Corace, 146 F.3d 51, 56 (2d Cir. 1998). When imposing a fine, the court must therefore consider several factors such as: (1) the need for the combined sentence to reflect the seriousness of the offense, to promote respect for the law and to provide punishment; (2) any evidence presented as to the defendant's ability to pay the fine; (3) the burden the fine places on the defendant and his dependents relative to alternative punishments; (4) any restitution or reparation the defendant has made or is obligated to make; (5) any collateral consequences of conviction, including civil obligations arising from defendant's conduct; (6) whether the defendant has previously been fined for a similar offense; (7) expected costs of incarceration and probation; and (8) any other pertinent equitable considerations. See U.S.S.G. 5E1.2(d); see also 18 U.S.C. 3572 (1994).
 
 
 39
 The sentencing court is not required to articulate specifically its findings regarding the fine other than to state in open court the reasons for its imposition of the particular sentence. See Corace, 146 F.3d at 56; United States v. Marquez, 941 F.2d 60, 65 (2d Cir. 1991). In this case, the court expressly indicated that it believed Reiss possessed substantial assets that were not reflected in the PSR, as evidenced by his style of living, his charity and his loans to others. The court concluded that Reiss could pay a substantial fine, ordered that Reiss and his co-defendant forfeit $ 1 million in substitute assets pursuant to the terms of the plea agreement, and imposed a fine of $ 6.3 million on Reiss.
 
 
 40
 The defendant has the burden of proving that he is unable to pay the fine imposed. See, e.g., United States v. Glick, 142 F.3d 520, 529 (2d Cir. 1998). Reiss has failed to meet this burden. According to the PSR, Reiss had the ability to pay a fine. The Probation Department noted that Reiss' income from 1993 through 1995 ranged from approximately $ 700,000 to approximately $ 7 million and he possessed bank accounts, securities, real estate and artwork with an approximate value of $ 423,900 as well as interests in several partnerships. Although Reiss repeatedly challenged the inclusion of the aircraft transaction on other grounds and addressed numerous other sentencing arguments, in none of Reiss' submissions did he claim that he was unable to pay the maximum fine. Only in a cursory manner in court on the very last day of hearings and after sentence was imposed, did Reiss allege (without substantiating his claim) that he does not have the assets to pay the fine.
 
 
 41
 The record reveals that the district court reviewed the extensive submissions regarding the propriety of the fine. Both parties were on notice that the maximum fine to be imposed would be $ 6.3 million. The record shows that the court seriously considered the imposition of the fine, as well as the entire sentence. Accordingly, the decision to impose the fine at the upper end of the Guidelines range was clearly within the court's discretion and was proper.
 
 
 42
 B. Resentencing under Federal Rules of Criminal Procedure 32 and 35
 
 
 43
 Reiss asserts that his PSR contained a variety of factual errors and that the district court failed to hear and make findings on Reiss' objections before sentencing. Reiss argues that this alleged violation of Fed. R. Crim. P. 32 entitles him to a remand for resentencing under Rule 35.
 
 
 44
 Fed. R. Crim. P. 32(c)(1) requires that the district judge give counsel "an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence." We find that the district court did in fact provide the defendant with this opportunity. Therefore, we conclude there was no Rule 32 violation in this case.
 
 
 45
 When the sentencing proceedings began on June 30th, the district court advised Reiss that it "will hear any challenges you have to the presentence report . . . and any particularized findings you wish and any facts or law that you wish the Court to find and any objections to [the] calculations." In complying with Rule 32, the court allowed Reiss to present nine character witnesses and to argue at length that he lacked knowledge of the drug trafficking source of the funds. The court further entertained extensive oral argument as well as reviewed voluminous written submissions on various aspects of the PSR and on downward departure motions. The court ruled on the enhancement and the departure issues, citing specific facts in support of its decision. The sentencing hearing stretched from June 30th through July 1st, and although the court did not perform a line-by-line review of the PSR, no such review is required in light of the court's rulings on sentencing matters based on the PSR.
 
 
 46
 Judge Weinstein presented Reiss with a limitless opportunity to address any issues relating to his sentencing, including his objections to the PSR throughout the three-day sentencing proceedings. There was no risk that the district court was relying on factual errors that the defendant was prevented from addressing. See United States v. Sisti, 91 F.3d 305, 310 (2d Cir. 1996) (holding that defendant should be assured the opportunity to present reliable sentencing information to the district court). Nonetheless, on July 10, 1998, Reiss filed a motion under Fed. R. Crim. P. 35(c) seeking to correct his sentence and claiming that Judge Weinstein erred by failing to address Reiss' specific objections to the PSR. Accordingly, Judge Weinstein directed the parties to submit any objections in writing and to appear before the court. Reiss filed his objections in a letter dated July 13, 1998, and challenged, as before, the issue of the $ 2.4 million airplane transaction included in the guideline calculations. At a hearing on July 13, 1998, the court rejected most of the objections to the PSR and refused to modify the sentence. The court also repeated its prior rulings that the government had proven Reiss' knowledge of the criminal derivation of the funds by a preponderance of the evidence and that the entire $ 2.4 million from the aircraft transactions involved the proceeds of drug trafficking. The court also rejected any request to modify the fine. Although the final hearing (held to address Reiss' concern that his objections to his PSR were not considered) took place on July 13th, after sentence was imposed, the district court found that resentencing was unnecessary because it had previously resolved the substantive challenges to the PSR. In addition, the court found that the remaining objections and changes requested by the defendant were "typographical or ministerial in nature." We affirm the district court.
 
 
 47
 The purpose of Rule 32(c) is to ensure that the PSR is completely accurate in every material respect, thereby protecting a defendant from being sentenced on the basis of "materially untrue" statements or "misinformation." See, e.g., United States v. Romano, 825 F.2d 725, 728 (2d Cir. 1987) (quoting Townsend v. Burke, 334 U.S. 736, 741, 92 L. Ed. 1690, 68 S. Ct. 1252 (1948)). "A defendant is provided this opportunity, and the notice requirement [of departures and adjustments] is therefore satisfied, as long as a defendant is adequately warned by the PSR, by the prosecution's submissions, or by the court sua sponte." Sisti, 91 F.3d at 310 (citing United States v. Contractor, 926 F.2d 128, 131-32 (2d Cir. 1991)). After careful review of the record, we agree with the district court that defendant's remaining objections to the PSR, addressed by the court after the imposition of the sentence, were errors of no substantive effect which did not require resentencing.
 
 
 48
 Even if there were a Rule 32 violation, we would be hard-pressed to find that grammatical changes to the PSR after imposition of a valid sentence would require resentencing, especially when the district court implicitly resolved all other substantive challenges concerning the PSR prior to sentencing and held an additional hearing to address defendant's remaining, yet minor, challenges to the PSR. See United States v. Margiotti, 85 F.3d 100, 103 (2d Cir. 1996) (holding that a technical violation of Rule 32 does not warrant resentencing, where the violation is promptly corrected and causes no harm). Considering the thorough manner in which the district court approached all aspects of its sentencing responsibilities, nothing that occurred in the court below would require resentencing pursuant to Rule 32.
 
 Conclusion
 
 49
 Considering the totality of the sentence imposed, we uphold the district court's imposition of the maximum fine allowed under the Guidelines. Further, we find that there was no Rule 32 violation requiring resentencing. We therefore affirm the sentence of the district court.
 
 
 
 Notes:
 
 
 *
 The honorable Nicholas Tsoucalas, Senior Judge of the United States Court of International Trade, sitting by designation.
 
 
 [1]
 On September 4, 1998, Reiss deposited with the Clerk of the Court sufficient funds to satisfy the amount of the fine in the event the government prevailed in this appeal.
 
 
 [2]
 U.S.S.G. 2S1.2(b)(1)(A) provides for a five-level enhancement for a money-laundering defendant who "knew that the funds were the proceeds of . . . an unlawful activity involving the manufacture, importation or distribution of narcotics or other controlled substances".
 
 
 [3]
 We note that the issue of whether the district court properly applied a clear and convincing standard of evidence to the 2S1.2 enhancement is not before us. Although the government objected to the heightened standard and filed a motion with the district court under Fed. R. Crim. P. 35(c) to correct the sentence, the district court denied the motion and the government did not appeal that ruling.
 
 
 [4]
 The district court imposed the following sentence in addition to the fine:
 The defendant's base offense level is 17. That has to be increased by 6 levels for the amount of funds involved in the illegality. Th[is] include[s] 2.4 million in the fall of 1994 in connection with the various airplane transactions; $ 400,000 in the winter of 1995 transaction; and $ 350,000 in the spring of 1996 transaction. That provides an adjusted base offense level of 23.
 As I have indicated, although the preponderance of the evidence and the probabilities indicate that this defendant knew that he was involved with drug transactions, I am applying a much higher standard which I consider appropriate to this case and, therefore, do not charge him, for guideline sentencing purposes, with that knowledge.
 . . . .
 Within his community and the community generally, the defendant was responsible for commendable acts of charity. He is entitled to a 1 level downward adjustment for these acts.
 For his physical impairments, a downward departure of 1 level is appropriate under the guidelines.
 These departures of 2 levels, along with his acceptance of responsibility and his taking part in a logjam plea, place defendant at offense level 16.
 I make that finding over the objections of probation.
 That calls for a period of incarceration of between . . . 21 and 27 months.
 The defendant is sentenced to 27 months of imprisonment.
 Upon completion of his period of confinement, he must be placed on supervised release for a period of three years.
 Tr. at 164-65 (June 30, 1998).