*410 EMILIO M. GARZA, Circuit Judge,
specially concurring:
I concur in the majority’s conclusion that the BT Appellants breached a fiduciary obligation under ERISA. I write separately to clarify which of the BT Appellant’s actions gave rise to liability. I also write to clarify the relationship between respondeat superior and fiduciary liability under ERISA.
The BT Appellants are liable under ERISA because the “lockbox” arrangement they negotiated had the effect of transferring “plan assets” — in this case, amounts in the general assets of the Debt- or belonging to the plans — to a secured creditor of the Debtor instead of the plans. At least two other courts have held that deducting employee contributions to plans from paychecks, and then paying creditors out of the general assets of the company instead of meeting the obligations to the plans, violates the fiduciary duty provisions of ERISA. LoPresti v. Terwilliger, 126 F.3d 34 (2d Cir.1997); Connors v. Paybra Mining Co., 807 F.Supp. 1242 (S.D.W.Va.1992). Department of Labor regulations define amounts withheld from employee paychecks to reflect contributions to plans as “plan assets.” 29 C.F.R. § 2510.3-102(a).[1] By paying creditors out of the general assets of the company instead of segregating the amounts belonging to the plans, the defendants in these cases “exercised control” over plan assets, making them fiduciaries under ERISA. *411 29 U.S.C. § 1002(21)(A) (defining “fiduciary” as a person who “exercises any authority or control respecting management of [the plan’s] assets”). Using the plan assets to pay creditors instead of segregating the assets into a separate fund breaches a fiduciary duty because it uses the plan assets for the benefit of the company instead of the benefit of the plan. 29 U.S.C. § 1104(a)(1) (requiring a fiduciary to “discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries”).
The “lockbox” arrangement negotiated by the BT Appellants meant that a creditor of the Debtor, Gibraltar, would be paid first out of the general assets of the company, even though a portion of those assets belonged to the plans. The BT Appellants therefore caused “plan assets” to be paid to a creditor instead of to the plans. This exercised control over “plan assets,” making BT a fiduciary under ERISA, and breached a fiduciary duty by using the assets for BT’s benefit instead of for the benefit of the plan participants.
The BT Appellants argue against attaching liability to the financing arrangement they negotiated because finding liability in these circumstances would deter “all asset-based financing involving accounts receivable financing.” They contend that the “lockbox” arrangement is a “normal and customary” business arrangement that should not be deterred. BT’s position is that lenders will not agree to a “carve-out” of their collateral in favor of possible ERISA obligations.
Either the creditors of a company, like Gibraltar, or plan participants will bear the risk of a company not being able to meet its obligations to both qualifying plans and creditors. When BT talks about creditors not being willing to “carve out” of its collateral, they are arguing that the plan participants, instead of creditors and by extension shareholders like BT who want to take advantage of cheaper financing, should bear the risk. This would be contrary to the essential purposes of ERISA, which is to protect plan participants and make sure that their contributions to the plans are used only for the plan’s benefit. Plan participants’ deductions should be used only to fund the plans, not as a subsidy to reduce the cost of capital for companies like BT.
The majority also correctly concludes that the BT Appellants are hable under ERISA by virtue of their control over how the $800,000 advanced from Gibraltar after December 15, 1995 would be spent. Although the money was advanced from Gibraltar to the Debtor, the trial court found that the BT Appellants, especially Dwor-kin, participated in the decision about how this money would be expended. ERISA defines anyone who “exercises any authority or control” over plan assets a fiduciary. The definition of “fiduciary” is phrased broadly: it extends to anyone who exercises “any” authority or control. We have therefore interpreted the term “fiduciary” liberally in the ERISA context. Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc’y of the U.S., 841 F.2d 658, 662 (5th Cir.1988). Here, even if the BT Appellants were not the persons formally vested by state law with the authority to dispose of the $800,000 advance, they nevertheless had some actual authority over how the Debtor would spend the funds. The Debtor’s officers, Ullman and Villano, answered to the BT Appellants. Because the BT Appellants exercised control over Ullman and Villano, who had control over plan assets, the BT Appellants were fiduciaries under ERISA.
In my view, the majority’s allusion to respondeat superior and the “active and knowing” requirement requires further explanation. Holding a person vicariously hable for breach of fiduciary duty under *412 ERISA involves a mix of federal and state law. ERISA supplies the standard for breach of fiduciary duty and the source of liability. State law determines who is vicariously liable and under what circumstances. See, e.g., id. at 665 (applying Louisiana law to determine if a principal was vicariously liable for a breach of ERISA by its agent). We have also added an additional, federal requirement to vicarious liability under ERISA: the principal must be an “active and knowing” participant in the agent’s breach. Id.
The “active and knowing” requirement means that respondeat superior will rarely do any heavy lifting in the ERISA context. Remember that ERISA makes anyone who “exercises any authority or control” over plan assets directly responsible as a fiduciary. Whenever a principal “actively” participates in an agent’s decision about how to use plan assets, he will, by virtue of his control over the agent’s actions, also be exercising a degree of control over the assets themselves. The “active and knowing” requirement therefore makes respon-deat superior basically a non-issue. The issue is only whether the principal, by virtue of its de facto control over the agent, also had control over the disposition of plan assets.
I agree with the majority that the relationship between the BT Appellants and the Officer Appellants resembles respon-deat superior. The BT Appellants exercised control over plan assets by virtue of their de facto authority over Ullman and Villano, the two people who had the formal legal authority to dispose of the $300,000 advance. .Assuming for the sake of argument that Ullman and Villano were not formally BT’s agents under state law, Ull-man and Villano responded to BT’s authority just as agents typically respond to their principal’s authority.
I would not give the phrase “active and knowing” the same prominence in this discussion as the majority chooses to give it, nor would I announce a new test for fiduciary liability under ERISA, as the majority seems to do. Although I agree that the situation here resembles respondeat superior, importing concepts from respondeat superior does not seem to provide any particular analytical value. The question in my mind is simply whether the BT Appellants exercised control over how the $300,000 advance would be spent. I agree with the majority that, on the facts as described by the trial court, the BT Appellants did exercise such control. As such, I agree that the BT Appellants are liable for using this advance to meet obligations of the Debtor other than those to the plans.
I therefore concur in the majority’s opinion.

. BT contends that, by the terms of the Department of Labor regulation, the "amounts deducted from employee paychecks” do not become plan assets until "the earliest date on which such contributions can reasonably segregated from the employer’s general assets.” 29 C.F.R. § 2510.3-102(a). If this interpretation of the regulation were correct, we would have to remand to the district court for it to determine the "reasonable date” for segregation, and the BT Appellants would only be liable to the extent that assets were transferred under the lockbox arrangement from the Debtor to Gibraltar after that date.
The BT Appellant’s interpretation is not correct. The correct interpretation is that the regulation provides that the amounts deducted from employee paychecks are plan assets immediately, but companies have a grace period before segregating the deductions from their general funds. See U.S. v. Corace, 146 F.3d 51, 53 (2d Cir.1998) (referring to the regulation as a “grace period between the deduction of employee contributions and their deposit into a plan”). The text of the regulation reads: "the assets of the plan include amounts ... that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer’s general assets.” Under BT’s interpretation the deducted amounts become plan assets when they can reasonably be segregated. The better read-mg, both grammatically and in terms of the purposes of the regulation, is that the deducted amounts are plan assets immediately and they are to be segregated as soon as reasonably possible. BT’s interpretation gives employers an ability and incentive to borrow against the plans in the dying days of a company without any real prospect of returning the funds. As long as the fiduciary is able to spend all of its assets before the "reasonable date” roles around, it is not liable at all for the deductions it took from the plans. This cannot have been an intended result of the regulation. The Department of Labor could not have intended for companies to be able to borrow with impunity from qualifying plans so long as the company is able to exhaust all of its assets before the debts become due.
When companies deduct contributions from employee paychecks, those amounts are not loans to the company that it can use for any purpose until the loan becomes due. Those contributions are monies that have already been paid to the employees as compensation. The company is acting merely as a steward; holding the plan participants’ property until the assets can be segregated into a separate fund. The company may not dip into the plan assets to use for its own purposes any more than it could dip into the private bank accounts of its employees to fund its shortfalls; once the contributions are withheld, the money no longer belongs to the company.