**UNITED STATES of America**

v.

**David JOHNSON, Defendant.**

**No. 00 CR. 1316(GEL).**

United States District Court, S.D. New York.

Jan. 2, 2002.

---

2. Plaintiff does not address whether or not her Federal claim confers subject matter jur-

*isdiction upon this Court.*

Daniel Margolis, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York), for United States of America, of counsel.

Richard Jasper, New York, New York, for Defendant David Johnson.

## OPINION

LYNCH, District Judge.

Defendant David Johnson pled guilty on March 13, 2001, to a single count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The parties have vigorously disputed a number of issues regarding the appropriate calcu-

lation of the sentencing guidelines range, and an evidentiary hearing was held on November 27, 2001. The legal and factual issues raised in the case, which concern the nature of defendant's conduct at the time of his offense, the possible application of an adjustment for obstruction of justice, and the calculation of defendant's criminal history score, warrant a written opinion resolving the issues in advance of sentencing, to guide the parties' further submissions or arguments at the final sentencing proceeding.

### Procedural Background

#### I. The Indictment and Plea

On November 24, 2000, Johnson was arrested by New York City police officers responding to a report of gunfire at an apartment in the Bronx, and soon turned over to federal authorities for prosecution. On December 28, 2000, a federal grand jury returned a single-count indictment charging Johnson with possessing a firearm that had been transported in interstate commerce, after having been convicted of a felony. Johnson pled guilty to that offense on March 13, 2001, after negotiations with the government had failed to result in a plea agreement. (11/27/01 Tr. 68, 75.)[1] Accordingly, at the time of the plea, both the prosecutor and Johnson acknowledged that there was no plea agreement limiting the punishment Johnson could receive (3/13/01 Tr. 3); that Johnson had not been offered any inducement to plead guilty (id. 16); that Johnson had been advised he could receive a sentence as high as ten years in prison (id. 12); that Johnson's ultimate sentence would be determined by the sentencing guidelines (id. 14–15); that no one could predict what Johnson's sentence might turn out to be until the completion of the presentence

report and the calculation of the appropriate guidelines range (id. 15); and that Johnson would not be allowed to withdraw his plea if the sentence turned out to be more than he expected or more than his attorney had predicted (id.).

Asked to describe, under oath, what he did that made him believe he was guilty of the charged offense, Johnson stated:

> I went to an ex-associate friend of mine[']s because he had owed me some money, and I knew he had a firearm in the house. I went in the house and he was talking about the money that he owed me and it was apparent that he wasn't going to give me what he owed me. So I went and got the firearm and I fired it into the ceiling, he paid me my money, and I left with the firearm in my coat pocket.

(Id. 16.)

#### II. The Initial Presentence Report

On July 9, 2001, the Court received a Presentence Report ("PSR") from the Probation Department. The PSR calculated Johnson's offense level as 24 and criminal history category as IV, resulting in a guideline range of 77 to 96 months imprisonment.

The sentencing guideline calculation was based on the assumption that under the facts admitted to by the defendant in pleading guilty, and determined by the Probation Officer from the case file, Johnson's actions constituted robbery. Therefore, pursuant to U.S.S.G. § 2K2.1(c)(1)(A), the PSR utilized the guideline for that offense, U.S.S.G. § 2B3.1. That guideline in turn dictated a base offense level of 20, plus an additional 7 levels because Johnson fired a shot during the robbery. The resulting offense

---

1. Apparently, the government had not presented its anticipated sentencing guideline calculation to the defendant as is customary in this district and as is recommended in *United States v. Pimentel,* 932 F.2d 1029 (2d Cir.1991).

level of 27 was then reduced by 3 levels by virtue of Johnson's acceptance of responsibility at his plea, for a final offense level of 24.

Johnson's criminal history category resulted from three prior convictions.[2] On September 23, 1987, Johnson was arrested in Texas in a car in which the police found 25 "rocks" of crack cocaine and two handguns, one in his pocket and the other in the rear of the car, and eventually convicted under state law of possession of a controlled substance. On January 2, 1988, while that charge was still pending, he was arrested again and ultimately convicted of involuntary manslaughter, after he and another individual had fired shots through the door of a motel room, killing one of the two persons present in the room. Apparently released on bail after this incident, he was arrested again on September 1, 1988, for threatening another individual with a firearm on that day, and convicted of aggravated assault with a deadly weapon. All of these cases were resolved by concurrent ten-year sentences imposed on or about May 1, 1989, in the Texas courts.[3] The PSR awarded Johnson three criminal history points for each of the convictions, with the total of nine points putting him at the top of criminal history category IV.

The government did not object to these calculations. Johnson's then-counsel submitted a letter objecting to both the offense level and the criminal history category assessed by the PSR. (Letter from of Howard L. Jacobs to Probation Officer Christopher Ferrall of 7/2/02.) First, he objected that there had been no robbery, pointing out that on his initial arrest by the NYPD, Johnson was charged with various offenses including use and possession of a firearm, reckless endangerment, trespass and criminal mischief, but not with robbery. (In this initial letter, counsel did not contest the facts of the offense as described by the PSR, but simply argued that those facts did not constitute robbery.) Accordingly, he argued that under U.S.S.G. § 2K2.1(a)(4), Johnson should have a base offense level of 20, reduced per his guilty plea to 17.

Second, counsel contended that because the three prior convictions led to concurrent sentences imposed simultaneously, they were "related cases" and thus should be treated as a single conviction, see U.S.S.G. § 4A1.2(a)(2), resulting in 3 criminal history points rather than 9 and a criminal history category of II. Conceding that the PSR's calculation "would be correct under present law," counsel nevertheless argued that the treatment of the prior record should be determined according to the guidelines in effect at the time of the conviction in 1989, under which, it was contended, counsel's calculation was required.[4]

2. Johnson's record includes a number of other convictions as well, but as these, for various reasons, did not result in additional criminal history points, they are irrelevant to the guideline calculation.

3. The sentences also ran concurrently with a five-year federal sentence for carrying a firearm during a drug trafficking crime, which had been imposed in January 1989 as a result of the September 1987 drug arrest.

4. See Federal Sentencing Guidelines Manual, 1990 edition, § 4A1.2, Application Note 3.

The current version of Application Note 3 provides that "Prior sentences are *not* considered related if they were for offenses that were separated by an intervening arrest (*i.e.*, the defendant is arrested for the first offense prior to committing the instant offense)." (Emphasis added.) In Johnson's case, each of the three prior offenses of which he was convicted constituted a separate transaction, and the later two of them each occurred after he had already been arrested for the previous offense.

When the Probation Department rejected these contentions, Johnson sought an adjournment of the scheduled sentence in order to further research the issues and brief them to the Court. On July 12, 2001, the Court granted the adjournment, but asked the parties to consider in their sentencing submissions the possibility that the PSR had erred in another respect:

> The PSR computes an adjusted offense level of 24 by applying USSG § 2K2.1(c)(1)(A), and then utilizing the robbery guidelines. However, by its terms, § 2K2.1(c)(1)(A) is only applicable "if the resulting offense level is greater than that determined" under the basic provisions of § 2K2.1(a) and (b). Applying those provisions, however, would seem to yield a higher offense level, thus making § 2K2.1(c)(1)(A) inapplicable.

Order of July 12, 2001. The Court's proposed calculation began with U.S.S.G. § 2K2.1(a)(2), which establishes a base offense level of 24 if a felon in possession of a firearm had at least two prior felony convictions for violent or narcotics offenses, which Johnson did. An additional four levels are added pursuant to U.S.S.G. § 2K2.1(b)(5), which applies "[i]f the defendant used or possessed [the] firearm ... in connection with another felony offense." Reducing the total of 28 by reason of defendant's guilty plea results in an offense level of 25, which is higher than the robbery calculation used in the PSR and thus applies under § 2K2.1(c)(1)(A). *See id.*

The Probation Department responded by preparing an amended PSR, accepting the accuracy of the Court's calculations. The government also agreed with the amended calculation (Letter from AUSA Daniel Margolis to Hon. Gerard E. Lynch of 8/2/01, at 3.)

### III. *Johnson's Change of Position*

In apparent response to these events, the Court received a number of communications directly from Johnson, as well as from his attorney.

On July 27, 2001, the Court received a letter from defense counsel, dated July 25, 2001, reporting that counsel had learned "that my client ... was not fully truthful with me" concerning the facts of the case. Enclosing a hand-written statement from Johnson, counsel stated that Johnson "did not go to the apartment to collect a debt but to get a woman named 'Chocolate' to leave the apartment because it was 'crack infested.' " Counsel requested a *Fatico* hearing [5] on the issue of whether Johnson had committed a robbery.

In an undated hand-written letter to the Court also received on July 27, and apparently not copied to defense counsel or to the government, Johnson himself stated that his sworn plea allocution had been false. He claimed that he had gone to the apartment "because of a woman who I was involved with that stayed there. I wanted her to leave there because I felt it was a bad atmosphere." Johnson stated that he never demanded any money from anyone, but that in the course of an argument over the woman, he obtained the gun belonging to the man who lived there, who then "offered me 30 dollars that he owed me." Johnson accounted for his allegedly false allocution as a ruse "because I did not want my girlfriend to find out the real reason why I went to Richard's apartment." Johnson reported that counsel had explained to him that the sentencing level would be either 20 or 24, and that he "did not think any of [what he said about the events in the apartment] mattered" to his sentence.

A few days later, the Court received yet another letter directly from Johnson. In

---

**5.** *See United States v. Fatico,* 603 F.2d 1053 (2d Cir.1979).

this letter, in addition to repeating in general terms that he did not commit a robbery, and reiterating counsel's argument about his criminal history, Johnson stated that if had known the government was charging him with robbery, he would have gone to trial, and that he "did not plead guilty knowingly intelligently and voluntarily" because he was not aware of the robbery charge. The Court provided copies of the letters received from Johnson to defense counsel and to the government. (8/7/01 Tr. 2.)

Unsurprisingly, at the scheduled sentencing hearing on August 7, 2001, Johnson appeared with new counsel, requesting substitution of counsel and an adjournment of the sentencing proceeding. Both applications were granted. (*Id.* 3, 7.) After further delays occasioned in part by the impact of the terrorist attacks on New York City, and the submission of written materials by both sides, the parties appeared for a sentencing proceeding on November 2, 2001. On that occasion, Johnson's present counsel disavowed any desire on Johnson's part to withdraw his guilty plea (11/2/01 Tr. 7), and counsel proceeded to argue the facts relating to the guidelines calculation. At Johnson's renewed request (*id.* 6), and over the government's objection (*id.* 2), the Court ordered a *Fatico* hearing to determine what Johnson had or had not done on November 27, 2000.

### IV. *The Fatico Hearing*

At the hearing, the government relied on Johnson's plea allocution. (11/27/01 Tr. 2–4.) Johnson called three witnesses: the arresting officer, Police Officer Luis Alemany, testified to his observations and his interviews with the occupants of the apartment; a homicide investigator, Detective Robert Dellanno, testified to his later interviews with the same witnesses; and Johnson's girlfriend, Jasaith Leetom, testified briefly concerning her observations that morning.

Officer Alemany testified that on November 24, 2000, at about 7:30 a.m., he and his partner responded to a radio call reporting gunfire at 4639 White Plains Road in the Bronx. (11/27/01 Tr. 18–19.) Arriving there, the officers observed Johnson with a silvery object in his hand, and told him to freeze. (*Id.* 20–21.) Instead of complying, he ran back into the building and up the stairs with the officers in hot pursuit. (*Id.* 21–22.)

On the second floor, Johnson forcibly broke through the door of an apartment. (*Id.* 37–38.) The officers followed him in, and found Johnson in a bedroom, where he had tossed his gun under a bed. Johnson was placed under arrest, and the officers assembled the occupants of the apartment, two women and a man, to determine what had occurred. (*Id.* 23–24.)

One of the women told Alemany that she had earlier encountered Johnson in the living room of the apartment, arguing with Richard Taylor, whose apartment it was, about money.[6] According to the woman, Johnson, whom she had met before, demanded money from Taylor, who said he didn't have any money. Johnson then pulled a gun from his pants and fired a shot in Taylor's direction, whereupon Taylor "panicked and handed Mr. Johnson $30." The woman did not characterize these events as a robbery. (*Id.* 26–28.)

Alemany then spoke to the other witnesses. Taylor confirmed that Johnson had demanded money, but did not say more about the reason for the demand. Johnson himself agreed that he was there to collect a debt. (*Id.* 29–30.) The second woman claimed that she had been in the

---

6. Alemany agreed that the women were named Shay Rahming and Shakee Brooks, but he was unable to recall which of the women made which statement. (*Id.* 24–25.)

shower and had not seen what was going on. (*Id.* 30.)

Alemany took Johnson into custody, and later that day filed a complaint against him, charging him with criminal possession of a weapon in the second degree, in violation of NYPL § 265.03(2), a class C felony; criminal use of a firearm in the second degree, in violation of NYPL § 265.08(1), a class C felony; reckless endangerment in the first degree, in violation of NYPL § 120.25, a class D felony; criminal trespass in the first degree, in violation of NYPL § 140.17(1), a class D felony; and criminal mischief in the third degree, in violation of NYPL § 145.05, a class E felony.

Detective Dellanno, who was assigned to the Bronx homicide unit, went to the apartment later that day to conduct further interviews. (*Id.* 39–40.) By this time, Taylor had decided that he did not want to be involved, and declined to speak to Dellanno, advising him to "talk to the girls." (*Id.* 42.)

Dellanno did. One of the women, Shakee Brooks, told him that she awoke to find Johnson in the apartment by the front door, armed with a gun. Johnson "put the gun in her face and asked for Richie." (*Id.* 43.) Taylor and Johnson then began to argue about money. Frightened, Brooks retreated to a bathroom, but when she heard a shot and saw a flash, she returned to the room, fearing Taylor had been shot. She noted that Taylor was "fine" and Johnson was still holding the gun. Taylor then gave Johnson money. Johnson took the money and left the apartment, returning in a few minutes "with what she believed was change," and gave it to Taylor. A few minutes later, Johnson returned again and forced his way into the apartment, "yelling 'cops'." She ran to a bedroom, followed by Johnson, and eventually by a police officer, who arrested Johnson and recovered the gun. (*Id.* 43–45.)

The other woman, Shay Rahming, also known as "Chocolate," observed Johnson, armed with a gun, arguing with Taylor. She saw Johnson fire the gun directly at a wall, and then leave the apartment after Taylor gave him some money. Johnson returned with change. Shortly thereafter, he returned and forcibly broke into the apartment, pursued by the police. (*Id.* 45–46.) Rahming said the dispute between Johnson and Taylor was about money, but did not specifically state that Johnson "demand[ed]" money. (*Id.* 50.) She also stated that she saw Johnson's "girlfriend at the front door of the apartment when the apartment door was opened the first time he came to the apartment." (*Id.* 46.) The girlfriend did not come into the apartment, but was standing "right at the doorway." (*Id.* 53.)

Finally, Jasaith Leetom, Johnson's girlfriend, testified that she and Johnson had gone to a party in the Bronx the night before these events. On the way home from the party to their home in New Rochelle, Johnson said "he had to go do something" and stopped off at the White Plains Road address. Leetom said she waited downstairs in the building, while Johnson went upstairs. (*Id.* 55–57.) After she heard what "could have been a gunshot," Johnson came down and asked her to go across the street with him to get change. They went into a store where Johnson got change. Johnson then told Leetom he was going back to the apartment "to give this guy back his change." Because she was tired, Johnson put her in a cab and sent her home. (*Id.* 58.) She thus was not present for the arrest.

Johnson himself did not testify at the hearing. (*Id.* 60.)

### Findings of Fact

1. The Court finds by a preponderance of the evidence that Johnson went to Tay-

lor's apartment intending to collect a debt that was owed to him, and that when Taylor resisted paying, Johnson used a gun to intimidate Taylor into paying.

The evidence supporting this conclusion is powerful and largely uncontradicted. First, there is Johnson's own sworn statements at his plea allocution, which must be given great weight. The statements were made under oath, unlike Johnson's later written statements, and were made on a solemn occasion. Moreover, they are consistent with what he told Officer Alemany at the time of his arrest. When Johnson later disavowed those statements, he had a powerful motive to do so, in order to reduce his guideline calculation; at the time of his allocution, in contrast, Johnson by his own admission did not appreciate that his statements could affect his sentence, and so had no reason not to be candid. The only motive Johnson has offered to explain why he would have fabricated this account of his encounter with Taylor—to avoid having his girlfriend Leetom learn about his relationship with one of the female occupants of the apartment—is entirely lacking in credibility. Johnson took Leetom along on the errand, and according to his own written account (undated letter from David Johnson to Hon. Gerard E. Lynch, received on July 27, 2001) and that of Rahming, he actually brought her up to the apartment. This behavior is hardly consistent with an attempt to keep her from learning about his business there.

Moreover, Johnson's sworn account is strongly corroborated by the accounts given to the police by the eyewitnesses to the events. Although this evidence is hearsay and would not be admissible at trial, it may properly be considered in a sentencing proceeding. *See United States v. Romano*, 825 F.2d 725, 728 (2d Cir.1987); *see also United States v. White*, 972 F.2d 16, 22 (2d Cir.1992). The Court finds these accounts reliable and probative. There is no reason to doubt that the eyewitness statements were in fact given as the officers' testimony stated. The testimony of both Officer Alemany and Detective Dallano was highly credible. Johnson attempted to impeach Alemany with evidence that he had once been disciplined by the NYPD for lying to superiors about an off-duty prank. (11/27/01 Tr. 9–17.) While the incident reflects poorly on Alemany's judgment at the time, having observed the officer's demeanor the Court was impressed that Alemany appeared appropriately embarrassed and repentant about the past event. When he turned from the discrediting episode to an account of the events of November 24, 2000, Alemany's demeanor noticeably brightened, and his account appeared crisp, professional, and disinterested. His account of the witnesses' responses to questions was convincing.

Moreover, Alemany's account was corroborated by that of Dallano, who interviewed the same witnesses later in the day, and reported being told essentially the same story. Johnson made little or no attempt to discredit Dallano's testimony. An experienced homicide investigator, Dallano made a particularly impressive witness. The Court is thus confident that the witnesses in fact made the statements attributed to them.

That, of course, does not make those statements accurate. The witnesses did not appear in court, and what little the record contains about their background does not inspire confidence. On the other hand, there is little reason to question their accounts. They had no reason to think that the reason for Johnson's presence in the apartment would matter to the authorities, or would get Johnson into deeper trouble, and no reason to hide any relationship Johnson might have had with

Rahming, or to attribute the argument between Johnson and Taylor to money rather than to that relationship.

In contrast to this substantial evidence, the record contains no credible testimony supporting Johnson's version of events. His own account is contained only in unsworn writings created after a strong motive to fabricate had arisen. The one witness called to support his account, Leetom, was by all accounts, including her own, not inside the apartment, and thus could not and did not support Johnson's story about the nature of the dispute with Taylor.[7]

Johnson's two principal arguments against the credibility of the eyewitnesses' accounts are unpersuasive. First, he points out that the women in the apartment and Leetom all agree that when given money by Taylor, he left the apartment and returned with change, something, he argues, a robber wouldn't do. But the government does not contend, and Johnson's allocution did not say, that he went to Taylor's apartment to steal whatever he could. Rather, the government contends only that Johnson, as he stated when pleading guilty and as the witnesses' statements suggest, went to the apartment to

collect a debt by force. That he did not take more than he was entitled to reduces the extent of his culpability, but does not cast any doubt on the government's account or suggest that the dispute was about a woman rather than about the debt.[8]

Second, he argues that the New York authorities did not charge him with robbery, thus suggesting that the police did not believe what they were told. But the police had more than enough other charges to bring against Johnson to justify an arrest, and the case was referred to the federal authorities before a more comprehensive determination of the appropriate state charges had to be made.[9] Moreover, while robbery, as discussed below, would be a valid charge on these facts, the charge arguably would lack jury appeal, given the small amount of money involved and Johnson's claim of right to it. The NYPD's failure to bring a robbery charge thus has no bearing on the credibility of the witnesses' accounts of the facts.

On this record, the conclusion is inescapable that Johnson's sworn allocution is closer to the truth than his later self-serving disavowals.[10] For all of the rea-

---

7. Her credibility, in any event, is suspect. *Leetom* acknowledged having feelings for Johnson that could bias her account (*Id.* 59), and her demeanor (the Court observed that while testifying, she never took her eyes off the defendant) suggested that she is under his influence Moreover, on the one point on which her testimony contradicted the hearsay statement of one of the occupants of the apartment, in a way that might add modest inferential support to Johnson's statement that he was trying to keep his reason for being there secret from Leetom (Rahming told Dallano that she had seen Leetom outside the apartment, while Leetom testified that she had waited downstairs in the lobby), Johnson's own written statement is consistent with Rahming's version rather than with Leetom's.

8. Moreover, Johnson's admission that Taylor gave him money undercuts his account of the

affair. The notion that Johnson spontaneously offered to pay the debt after the gun was fired in order to deflect Johnson's anger over a completely different subject is highly implausible.

9. A federal complaint charging Johnson with possession of a firearm by a convicted felon was filed on November 27, 2000, only three days after his state arrest.

10. Johnson's allocution does differ from the witnesses' accounts in one respect. Johnson claimed at his plea that the gun was actually Taylor's. Brooks and Rahming consistently told the police that Johnson came to the apartment with the gun. While it would be reasonable to conclude that Johnson's version was fabricated to minimize his culpability, it is unnecessary to resolve the discrepancy.

sons set forth above, the Court finds that Johnson possessed and fired the gun in order to frighten Taylor and thereby induce Taylor to pay him money that Johnson claimed was owed to him.

2. The Court also finds that Johnson deliberately advanced a false account of the facts in letters to the Court and in statements to counsel intended to be forwarded to the Court. The Court finds by a preponderance of the evidence, moreover, that his specific intention in doing so was to obstruct justice by leading the Court to determine an incorrectly low sentencing level for his own benefit, to which he was not entitled. Johnson clearly knew the real purpose of his possession and use of the firearm, and accurately reported that purpose in his allocution. His disavowal of that allocution was thus knowingly false. The only logical inference is that he made these false statements in order to minimize his culpability and obtain a more favorable sentencing guidelines calculation.

*Conclusions of Law*

■■■ Under New York law, using force to take money from another person, even under a claim of right, constitutes robbery. New York Penal Law § 160.00 provides that a person commits robbery when, in the course of a larceny, "he uses or threatens the immediate use of physical force upon another person for the purpose of . . . compelling the owner of such property or another person to deliver up the property." Larceny is defined as the intentional wrongful taking of property "from an owner." N.Y. Penal Law § 155.05(1); *See People v. Coates*, 64 A.D.2d 1, 407 N.Y.S.2d 866, 869 (2d Dep't 1978). It is clear, moreover, that under New York law,

a claim of right to the property in question is not a defense to robbery. *Lebron v. Mann*, 40 F.3d 561, 563 (2d Cir.1994) ("under New York law, an attempt to take money by force, even under a good-faith claim of right, is robbery.") (citing *People v. Reid*, 69 N.Y.2d 469, 475, 515 N.Y.S.2d 750, 508 N.E.2d 661 (1987)); *People v. Duval*, 172 A.D.2d 248, 568 N.Y.S.2d 80, 81–82 (1st Dept.1991); *People v. Hodges*, 113 A.D.2d 514, 496 N.Y.S.2d 771 (2d Dep't 1985). Johnson's forcible taking of the money he was owed while displaying a firearm is classified as robbery in the second degree, a class C felony under New York law. N.Y. Penal Law § 160.05.

■■ Since Johnson used the gun in order to get Taylor to part with his money, albeit under a claim that he was merely collecting money owed to him, he used it to commit a felony.[11] Therefore, the Court concludes that the four-level adjustment provided by U.S.S.G. § 2K2.1(b)(5) is applicable. The penological justification for that adjustment, moreover, fully applies to this case. The base offense level for the offense applies to the purely passive possession of a gun by a convicted felon, even if for lawful purposes. But Johnson actually used the weapon for violent criminal purposes, thus aggravating his culpability beyond that basic level. A substantial enhancement for that aggravating circumstance is entirely appropriate.

■ In addition, the Court concludes that a two-point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 is also called for on these facts, since the Court has found that Johnson intentionally made misleading statements to the Court in order to deny relevant

---

**11.** Moreover, although Johnson's argument has focused on robbery, as that was the offense highlighted in the PSR, the government is correct that even if robbery had not been established, the record would still support a

finding that Johnson had committed several other felonies, including reckless endangerment, trespass, and criminal use of a firearm, as charged in the state court complaint.

conduct that would have an impact on his sentence and obtain a lower sentencing level than he deserves.

■ Ordinarily, this conclusion would also lead to a revocation of Johnson's credit for acceptance of responsibility. *See United States v. McLeod*, 251 F.3d 78, 82–83 (2d Cir.2001). The Court declines to reach this result, however, for two reasons. First, Johnson has never formally moved to withdraw his guilty plea.[12] As his counsel has consistently and wisely emphasized, he has at all times acknowledged his guilt of the underlying offense. Second, Johnson did not testify at the *Fatico* hearing, and thus avoided committing perjury by repeating his false account of events under oath. These forbearances entitle him, in the Court's view, to some credit. Put another way, it is appropriate to hold revocation of the acceptance of responsibility adjustment in reserve for situations in which a defendant does compound his obstruction in these ways. Extensive precedent supports granting acceptance of responsibility credit despite obstruction of justice, in appropriate cases. *See United States v. Restrepo*, 936 F.2d 661, 669 (2d Cir.1991); *United States v. Enriquez*, 42 F.3d 769, 773 (2d Cir.1994); *United States v. Enriquez*, 42 F.3d 769, 773 (2d Cir. 1994); *United States v. Ruggiero*, 100 F.3d 284, 295 (2d Cir.1996); *United States v. Kelly*, 169 F.Supp.2d 171, 173–174 (S.D.N.Y.2001); *U.S. v. Maurer*, 76 F.Supp.2d 353, 360 (S.D.N.Y.1999).

■ Finally, the Court concludes that Johnson's criminal history score was correctly calculated by the PSR. The guidelines sentencing range, including the criminal history score, is calculated according to the guidelines in effect at time of sentencing, unless the guidelines in effect at the time of the offense provide a lower sentence. *See United States v. Keller*, 58 F.3d 884, 889 (2d Cir.1995) (citation omitted). Here, the guidelines provided for the same criminal history calculation both at the time of sentencing and at the time of the offense. Under the guidelines in effect at both times, Johnson's three Texas convictions are not treated as related offenses, because they were separate incidents separated by arrests. *See* U.S.S.G. § 4A1.2(a)(2), Application Note 3. How the guidelines calculated criminal history for offenders who committed crimes in 1988 is irrelevant. Johnson is not being punished for the offenses he committed in 1987 or 1988, but for the instant conduct, committed at a time when the guidelines made the consequences of such an offense perfectly clear.

Indeed, if the guidelines *did* treat these offenses as related cases for purposes of calculating the criminal history score, the Court would depart upward pursuant to U.S.S.G. § 4A1.3 because criminal history category II "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." This provision (which existed in identical form in the 1989 guidelines that Johnson contends should apply) specifically contemplates the possibility that the related cases rules might lead to an undercounting of a defendant's criminal record. *See* § 4A1.3(b) (giving as an example of a case warranting departure situations where "prior sentences of substantially more than one year [were] imposed as a result of independent crimes committed on different occasions") and § 4A1.3, second paragraph (giving as an example cases where the defendant "had received a prior consolidated sentence of ten years for a series of

---

12. Although Johnson did indicate a desire to withdraw his plea in one of his uncounseled letters to the Court, he quickly withdrew that request when he next appeared in court with counsel. (11/2/01 Tr. 7.)

serious assaults"). Moreover, as the eventual amendment of the definition of related cases reflects, the rule counting prior sentences as related merely because the cases were consolidated for sentencing can result in significant underestimation of a defendant's dangerousness. This possibility has always been recognized in the guidelines as a potential basis for an upward departure. *See* U.S.S.G. § 4A1.2, Application Note 3 (urging courts to "be aware that there may be instances in which this definition [of related cases] is overly broad and will result in a criminal history score that underrepresents the seriousness of the defendant's criminal history"). The 1989 version of the guidelines not only contained this very warning, but went on specifically to cite cases in which "the defendant commit[ted] a number of offenses on independent occasions separated by arrests"—the situation of this case, and the one eventually covered by a change in the definition of related cases—as one in which the then-existing rules would "not adequately reflect either the seriousness of the defendant's criminal history or the frequency with which he commits crimes." § 4A1.2, Application Note 3 (1989).

All three of Johnson's relevant prior convictions, like the instant offense, involved the use of firearms in a violent crime (one of which cost a human life) or the possession of firearms in connection with a narcotics offense. Criminal history category II, which Johnson contends applies to him, could be achieved by a far less serious and violent record than he has accumulated. To sentence him according to that category would ignore his violent past and serious potential for an equally violent future. Thus, it is clear that Johnson's "criminal history [is] significantly more serious than that of most defendants" in criminal history category II, and a departure to category IV would be warranted. § 4A1.3, ¶ 2.

## CONCLUSION

Accordingly, the Court finds that the correct guidelines calculation is as follows:

· Base Offense Level of 24, pursuant to U.S.S.G. § 2K2.1(a)(2), because Johnson had at least two prior felony convictions of crimes of violence or controlled substance offenses.

· Upward adjustment of 4, pursuant to U.S.S.G. § 2K2.1(b)(5), because the defendant did not merely possess the firearm, but also used it in connection with another felony offense.

· Upward adjustment of 2, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice.

· Downward adjustment of 3, pursuant to U.S.S.G. § 3E1.1(a) and (b)(2), for acceptance of responsibility and an early plea.

The Court therefore finds that the defendant's offense level is 27, his criminal history category is IV, and the correct sentencing range under the guidelines is 100–125 months.

The Clerk of the Court is respectfully directed to docket defense counsel's letter of July 25, 2001 (and enclosed hand-written statement), defendant's two letters to the Court, and the government's letter of August 2, 2001, so that they can be made part of the record of this case.

SO ORDERED.