UNITED STATES of America,

v.

Scott MAURER, Defendant.

Nos. 97 CR 1326 (SAS), 98 CR 852 (SAS), 98 CR 1452 (SAS).

United States District Court,
S.D. New York.

July 26, 1999.

David Greenwald, Assistant United States Attorney, New York City, for Government.

Lisa Scolari, New York City, for Defendant.

## OPINION

SCHEINDLIN, District Judge.

*Background*

Defendant Scott Maurer is a 36 year old man who, up to the time of the instant offenses, had no interaction with the criminal justice system. In September 1998, he was found guilty of one count of wire fraud following a jury trial. Thereafter, he pled guilty to two subsequent indictments, one for forged endorsements on Treasury checks and the other for bank fraud. At defendant's request, the Court has agreed to consolidate these cases for sentencing. These cases are summarized as follows:

1: 97 CR 1326–01 is a one-count indictment charging wire fraud. Mr. Maurer was convicted of this charge following a trial in which he was found guilty. The criminal conduct here occurred between December 1995 and December 1996 and involved fictitious invoices from his court reporting business to Interim Services, Inc., an outside payee (the "Interim" case).

2: 98 CR 852–01 is a one-count indictment charging conspiracy to pass Treasury checks bearing falsely made and forged endorsements. Mr. Maurer pled guilty to this charge on December 17, 1998. The criminal conduct here occurred between January 1993 and June 1994 and involved the cashing of Mr. Maurer's deceased grandfather's social security checks (the "Social Security" case).

3: 98 CR 1452–02 is a four-count information charging four counts of bank fraud. Mr. Maurer pled guilty to these charges on January 17, 1999. The criminal conduct here occurred between June 1994 and May 1995 and involved the submission of forged checks to Chase Manhattan Bank and Fleet Bank (the "Forged Check" case).

All counts of conviction are grouped together pursuant to United States Sentencing Guideline ("U.S.S.G." or the "Guidelines") § 3D1.2(d), as the offense level is determined largely on the basis of the total amount of loss. The applicable guideline for these offenses is found at § 2F1.1(a), which requires a base offense level of 6.

There are a number of disputes in this case, both as to (1) offense level: specifically, the intended loss amount, obstruction of justice and acceptance of responsibility; and (2) departures: specifically, the government's motion for an upward departure based on criminal history category, and the defendant's motion for a downward departure based on community involvement and family circumstances. I will address each of these issues *seriatim.*

### Offense Level

**A. Intended Loss Amount**

The increase in the base offense level is set by determining the amount of the actual loss or the intended loss, whichever is greater. *See* Application Note 8 to § 2F1.1. *See also United States v. Mills,* 987 F.2d 1311, 1315–16 (8th Cir.1993) (use entire $1.5 million fraudulently received from victims as loss amount even though defendant returned approximately half in response to threatened legal action); *United States v. Katora,* 981 F.2d 1398, 1406 (3d Cir.1992) (use the greater intended loss even though actual loss is easily calculated).[1] The amount of loss in the Social Security case is not in dispute. The Government and the defense agree that the loss in that case amounted to $10,486.

---

1. To date, only the Sixth and Tenth Circuits have held that an intended loss under § 2F1.1 cannot exceed the loss the defendant could have in fact occasioned if his fraud had been entirely successful. *See United States v. En-* *sminger,* 174 F.3d 1143 (10th Cir.1999) (citing *United States v. Galbraith,* 20 F.3d 1054 (10th Cir.1994)); *United States v. Khan,* 969 F.2d 218 (6th Cir.1992).

Similarly, the amount of loss in the Forged Check case is not in dispute. The Government and the defense agree that the total amount of the intended loss in that case amounted to $31,350.77.

The amount of loss is in dispute with respect to the Interim case. Before computing the amount of loss, it is first necessary to describe the scheme to defraud employed by the defendant in that case. Interim Services, Inc. ("Interim") and Westchester Reporting Service ("Westchester")[2] entered into an agreement whereby Interim would advance the payment of Westchester's court reporting invoices for a fee. A simple example will serve to explain how the agreement was supposed to work. Assume that Westchester used an independent court reporter to take a deposition. Assume further that the invoice to the law firm client was $2,000. Interim would pay, for example, $1,000 directly to the court reporter,[3] and then forward 84% of the gross profit to Westchester, here $840, known as the net profit. It would retain, as its fee, 16% of the gross profit, here $160. If the client failed to pay the $2,000 after 150 days, Westchester would be required to pay back to Interim the entire invoice amount of $2,000. This is known as a charge-back.

Here, the defendant submitted 332 fictitious invoices to Interim for court reporting services allegedly performed by AACR.[4] These invoices were fictitious in that there was no client, nor was there a court reporting job. The total amount that Interim would have paid on these invoices is $593,187, namely the court reporter component of each invoice and the net profit component of each invoice. The total face amount of the invoices was $628,014.80. This number includes the 16% of the gross profit on each invoice that Interim would retain for itself.

It is undisputed that Interim did not "lose" all of the $593,187 because some of that amount was "charged back" by Interim. In addition, the defendant anonymously paid back some of this amount to keep the scheme going. The question, then, is how to calculate the actual loss or the intended loss, whichever is greater, for the purpose of properly calculating the offense level.

The defendant argues that he should only be responsible for that money which found its way into his pocket. Interim would cut two separate checks—one to the fictitious court reporter and one to Westchester for the net profit. The defendant cashed the court reporter component, but the net profit component was put into Westchester's business. He argues that he could not have intended to steal the net profit amount paid to Westchester because he knew that he could not get at that money. Defendant further argues that because of the charge-back system, he could not have intended to steal the full amount of the invoice. He believes that he is entitled to credit for the amount of money charged back by Interim and for any money he paid back to Interim—namely $75,000.

Defendant's argument is flawed because it focuses on the amount gained by the defendant rather than the amount lost by the victim. He argues that because he could not get at the portion paid to Westchester, it should not be included in the loss amount. This is simply wrong. That

---

**2.** From 1988 through August 1995, the defendant was the president and majority shareholder of a court reporting service called All American Court Reporting, Inc. ("AACR"). In August of 1995, AACR merged with Westchester and became bound by the terms of the agency agreement previously entered into by Westchester and Interim. Although defendant became an officer and shareholder of Westchester, he continued to operate AACR as a separate facility. It was AACR that submitted the false invoices to Interim for payment, *see infra*.

**3.** The Court is unaware of the actual percentage split between the court reporter and the court reporting company.

**4.** At oral argument, all parties agreed on the number of fraudulent invoices.

amount is part of the intended loss, because it permitted the scheme to continue, to the sole benefit of the defendant.

The Government, on the other hand, argues that the defendant is responsible for the actual loss to Interim and to Westchester ($489,609—the sum of the court reporter portion actually received by the defendant and the net profit portion actually received by Westchester). The Government argues that no charge-backs should be subtracted from this actual loss figure.[5] In this regard, it must be noted that Westchester "lost" the $103,755 which Maurer stole because it was required to pay it back to Interim. In addition, the charge-back was the "full amount of the invoice, including the 16% portion retained by Interim." So Westchester's loss was even greater than $103,755. Therefore, even under this theory, the actual loss probably remains at $490,000—assuming no credit for the $75,000 returned by Maurer.

■ In the alternative, the Government argues that the proper measure of "loss" is the amount that Maurer intended to steal from Interim (and Westchester). This figure is $593,187 and represents the total amount of the fraudulent invoices minus only the 16% of gross profit retained by Interim. I concur with this alternative argument and conclude that the intended loss is $593,187, The reason for this conclusion is actually quite simple. The invoices were entirely fraudulent. Their submissions were intended to cause Interim, the victim, to pay out that money, either to a fictitious court reporter or to Westchester. While it is true that once the invoice was not paid, which was inevitable, the net profit received by Westchester would be paid back to Interim, there is no doubt that the phony invoice scheme put Interim at risk of losing the entire sum. The scheme was destined to crash. The charge-back, it must be remembered, was of the entire invoice amount. Thus, West-

chester was required to pay the court reporter portion (which it did not have) and the 16% profit retained by Interim (which it did not have) and the net profit portion (which it may or may not have spent). There is no doubt in my mind that in attempting to extract $593,187 from Interim, the defendant put Interim at risk of losing that amount.

■ In addition, as the Second Circuit has held, payments made to keep the scheme up and running should not be credited to the defendant when calculating the amount of intended loss. *See United States v. Mucciante*, 21 F.3d 1228, 1238 (2d Cir.1994) ("Under the Guidelines, 'loss' includes the value of all property taken, even though all or part of it was returned."); *United States v. Arjoon*, 964 F.2d 167, 171–72 (2d Cir.1992) (upholding Pre–Sentence Report calculation of loss based on the entire value of the stock at the time it was stolen and rejecting district court's subtraction of the value of the stock returned prior to discovery of the embezzlement; defining loss as the value of what was taken). *See also, e.g., United States v. Corace*, 146 F.3d 51, 55 (2d Cir.1998).

Here, it is obvious that for a period for time, however short, Westchester would be able to pay back the charged back amount to Interim, as the phony invoices were only a portion of the business that Westchester did with Interim. This, however, should not benefit the defendant for two reasons. First, it was only by these means that the defendant was able to continue stealing from Westchester; second, the 16% of gross profit charged back to Interim had never been paid to Westchester. Thus, at a minimum, Westchester was paying back money that it had not obtained from Interim. I therefore find that any charge-backs during the scheme were anticipated by Maurer as an integral part of permitting the scheme to continue. The same is true of the anonymous payment of $75,000.

---

**5.** If charge-backs were subtracted, $103,755 would be subtracted from the court reporter component and $41,777 would be subtracted from the net profit component.

■ For the same reasons, I find that the actual loss figure is $489,609 because once again the defendant is not entitled to any credit for the charge-backs or anonymous payback. Because the intended loss figure is higher, it will be used to set the offense level. However, I note that under either calculation, when the $41,000 from the other two indictments are added in, both the intended loss and the actual loss fall in the category of more than $500,000 but less than $800,000. Accordingly, a 10–level enhancement (to 16) is warranted pursuant to § 2F1.1(b)(1)(K). Because these offenses involved repeated acts over a period of time, a 2–level more-than-minimal-planning enhancement (to 18) is also warranted pursuant to § 2F1.1(b)(2)(A).

## B. Obstruction of Justice

Section 3C1.1 of the Guidelines provides for a 2–level increase in a defendant's offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, *or sentencing of the instant offense of conviction.*" (emphasis added). The Commentary to § 3C1.1 offers as examples of such obstructive conduct "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" and "providing materially false information to a judge or magistrate." Application Notes 4(c) & (f).

The Government argues that a 2–level enhancement is required as a result of defendant's multiple obstructive efforts. The Government asserts that the defendant committed at least five separate acts of obstruction, including:

 a. Dissuading Richard Kraus, Maurer's former business partner from reporting Maurer's criminal conduct to state law enforcement officials

through verbal and physical intimidation;

 b. & c. Asking Olga Gill and Brenda Ferrer, two of Maurer's former employees, to sign affidavits falsely accusing Kraus of criminal conduct;

 d. Falsely reporting to the Probation Office that Maurer had obtained a college degree;[6] and

 e. Submitting a forged letter from the Staten Island Jewish Community Center in connection with this sentencing proceeding.

There is a question as to whether the first three instances of obstructive conduct fit within the parameters of the enhancement section. Pertinent to this inquiry is whether the phrase "during the course of the investigation" used in § 3C1.1 necessarily requires that the misconduct occur after an investigation has been commenced and not before. This question appears to be one of first impression in this Circuit and will be addressed after a discussion of the fifth charge.

■ The fifth charge of obstruction, submitting a forged letter in connection with these sentencing proceedings, is sufficient, in itself, to sustain the enhancement. *See United States v. Ventura,* 146 F.3d 91 (2d Cir.1998) (2–level upward departure affirmed where defendant submitted a false foreign birth certificate to persuade the court that he qualified for sentencing as a juvenile). Here, the defendant submitted to the Court a letter of recommendation on stationery of the Jewish Community Center of Staten Island ("JCC") detailing his extensive community service. Evidence adduced at a hearing revealed that he wrote the letter, forged the Assistant Program Director's (Michael Reape) signature, and never showed the letter to Reape. The letter stated that the JCC was willing "to have Scott work with us on

---

**6.** This fourth charge, regarding the college degree, is not sufficient to obstruct or impede the administration of justice. Whether or not Maurer was a college graduate could not and would not have any material affect on these proceedings. It is simply not serious enough to warrant an obstruction of justice enhancement.

a full time basis as part of any sentence you would impose on him not involving prison." This letter was a deliberate forgery and was misleading. Mr. Reape did not know that Mr. Maurer intended to submit a letter on JCC stationery, with his signature, as part of a sentencing proceeding, nor did he approve the contents of the letter.

The defense argues that Mr. Reape was willing to write a letter of recommendation for his friend, the defendant, but had not yet done so. In addition, Mr. Finkelstein, the Program Director of Physical Education at the JCC, testified at a bail revocation hearing that he would be willing to have the defendant perform community service by working at the JCC. These facts do not, however, excuse Mr. Maurer's attempt to mislead the Court. At the time the forged letter was submitted to the Court, Mr. Maurer had never discussed the so-called community service "offer" with Mr. Finkelstein or anyone else at the JCC. The fact that Mr. Finkelstein was subsequently willing to make such an offer, some time after the letter was submitted, cannot make the letter retroactively true.[7] If the Government had not conducted a thorough investigation, it is unlikely that anyone would have ever known of the letter's falsity. I am sure that I would have accepted the letter as genuine, which it was not, and would have relied on it to a certain degree. Thus, I find by clear and convincing evidence that Mr. Maurer intended to obstruct the administration of justice during these sentencing proceedings by submitting a forged letter from the JCC regarding, *inter alia*, community service. *See United States v. McKay*, 98 CR 1527, slip op. 4565, 4581 (2d Cir. July 7, 1999) (§ 3C1.1 adjustment warranted where defendant made false statements to a probation officer regarding his role in a related offense—lies were made during the sentencing phase of the instant offense

that, if believed, would have affected the sentencing); *United States v. Case*, 98 CR 1735, slip op. 4223, 4230 (2d Cir. June 17, 1999) (defendant's submission of sworn inaccurate IRS forms was "completely intentional and designed to stave off the IRS's attempts to collect" the remainder of the debt). Accordingly, an additional 2–level enhancement (to 20) is warranted pursuant to § 3C1.1 based on defendant's attempted obstruction of justice.

As an alternative ground for the imposition of an obstruction of justice enhancement, I conclude that a 2 point enhancement is also warranted based on the first three obstructive acts listed above. Based on the testimony at trial, I find that defendant engaged in the obstructive conduct alleged in the first three events, and that he fully intended his conduct to derail any criminal investigation, prosecution or conviction.

The defense argues that this conduct cannot serve as the basis for an obstruction of justice enhancement because the language of § 3C1.1 speaks of an obstruction of justice *"during the course of the investigation, prosecution or sentencing of the instant offense of conviction."* (emphasis added). While this argument is initially appealing, it must ultimately be rejected. This issue was addressed in *United States v. Barry*, 938 F.2d 1327, 1333–34 (D.C.Cir.1991), which I find to be persuasive precedent. In that case, the D.C. Circuit stated:

> If one were to construe the language of § 3C1.1 literally, one might conclude, as appellant does, that the obstruction must have occurred after the authorities had already begun investigating the offense of conviction. Such an interpretation would, however, produce some counterintuitive, even absurd, results. The enhancement would not apply to a

---

7. Even at this moment, it is not clear to me that the "offer" discussed by Mr. Finkelstein at the bail revocation hearing was really extended by the JCC which did not have the

opportunity, as an institution, to consider Mr. Maurer's criminal background when making a decision regarding potential community service.

defendant who attempts to obstruct an investigation even before he commits the offense, as for example, by bribing a prosecutor or police officer not to undertake an investigation of his future conduct.

The Government offers additional arguments on this issue. In obstructing an investigation before it begins, the defendant is attempting to insure that there will be no prosecution, rather than attempting to disable a prosecution underway. Clearly the effects of the former on law enforcement are far more devastating. In addition, as noted by the Government, the victim of pre-investigation intimidation has nowhere to turn, which is not true of a potential witness in an ongoing investigation. I also rely on Application Note 4(i) to § 3C1.1 which notes that "other conduct prohibited by obstruction of justice provisions under Title 18" qualifies for the enhancement. Because intimidating a witness would be an offense under Title 18, the behavior noted in the first three acts of obstruction qualify for the enhancement. Thus, under either alternative, the forged letter or the intimidation of witnesses, a 2–level obstruction of justice enhancement applies and increases the offense level to 20.

## C. Acceptance of Responsibility

■ The next question is whether the defendant is entitled to any reduction based on acceptance of responsibility. There are two arguments against awarding this reduction. The first is that the Government was forced to spend considerable resources in trying the Interim case.[8] The second, and perhaps more difficult, is that an obstruction of justice enhancement is ordinarily inconsistent with a finding of acceptance of responsibility. *See* U.S.S.G. § 3E1.1, Application Note 4 (conduct resulting in an enhancement for obstruction of justice ordinarily indicates that the defendant has not accepted responsibility—

there may be extraordinary cases in which the adjustment may still apply). However, in appropriate circumstances both adjustments may apply. *See United States v. Enriquez,* 42 F.3d 769, 773 (2d Cir.1994) ("a defendant may have engaged in conduct constituting an obstruction for which a penalty enhancement is appropriate, but subsequently come to accept responsibility fully"); *United States v. Restrepo,* 936 F.2d 661, 669 (2d Cir.1991) ("the sentencing judge is best situated to evaluate the defendant's acceptance of responsibility").

■ With respect to the obstruction of justice, I make the following findings. The first three obstructive events, intimidating witnesses in the Interim Case, occurred long ago and well before the defendant accepted responsibility by pleading guilty to the Social Security and Forged Check cases. Those events, occurring years before his guilty pleas, do not negate a finding that he has accepted responsibility for that criminal conduct and thereby saved limited prosecutorial and judicial resources. The forged sentencing letter incident is more troubling. Here, however, the defendant deserves the benefit of the doubt. Although defendant wilfully submitted a false document in an attempt to obtain a favorable sentence, this does not negate the finding that he accepted responsibility for what he did in the two cases in which he pled guilty. His conduct did not attempt to conceal any new thefts or schemes to defraud innocent victims. Rather, he believed that because the JCC would make the offer, he was merely presenting the Court with a viable sentencing option. While I have already found that this amounts to an obstruction of justice, extraordinary circumstances are present here such that the exception in Application Note 4 applies.

In sum, a 1–level reduction (to 19) for acceptance of responsibility, pursuant to

---

8. Although the defendant went to trial on one of the three cases for which sentence is imposed, he did not go to trial on the other two.

Rather, he pled guilty thereby saving the Government and the Court significant time and resources.

§ 3E1.1(a), is warranted based on Mr. Maurer's acceptance of responsibility with respect to two of the three offenses that have been consolidated for sentencing. While this section generally calls for a 2–level reduction, that would not be right in this case. As already noted, the Government was forced to try a relatively complicated case at great cost of time and expense. However, the defendant's decision to plead guilty on the remaining charges did save the Court and the Government a good deal of effort. In recognition of this acceptance of responsibility, a 1–level reduction is warranted. I rely on § 5K2.0 as a basis for this departure for partial acceptance of responsibility because the unusual occurrence of an acceptance of responsibility for some crimes, but not others, places this case outside the heartland of cases and was not considered by the Sentencing Commission. Thus his final offense level is 19.

### Departures

The Government seeks an upward departure with respect to Criminal History Category and the defendant seeks a departure with respect to family circumstances.

### A. Criminal History Category

Section 4A1.3 explicitly provides for an upward departure "where the court concludes that a defendant's criminal history category significantly under-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." *See also United States v. Ashley*, 141 F.3d 63, 69 (2d Cir. 1998) (Guidelines authorize a departure where a defendant's criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that he will commit further crimes); *United States v. Rivers*, 50 F.3d 1126, 1131 (2d Cir.1995) (a sentencing judge should exercise discretion whenever she concludes that the criminal history calculation under-represents the seriousness of defendant's prior record).

■ Defendant has no convictions prior to the three convictions which have now been consolidated for sentence. This would ordinarily place him in Criminal History Category I. However, the Government has moved for an upward departure on the basis of § 4A1.3, which states:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

The Government argues that a Criminal History Category of I does not adequately reflect the seriousness of the defendant's past criminal conduct.

The three crimes to which Mr. Maurer pled guilty have been consolidated for sentencing purposes. Section 4A1.2(a)(2) states: "Prior sentences imposed in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b) and (c)." Application Note 3 to this section defines the term "related cases" as follows: "prior sentences are considered related if they resulted from offenses that ... were consolidated for trial or sentencing." However, this same Note recognizes that "there may be instances in which this definition is overly broad and will result in a criminal history score that underrepresents the seriousness of the defendant's criminal history and the danger that he presents to the public." The Note concludes that where the defendant has been convicted of a number of serious non-violent offenses which have been consolidated for sentencing, an upward departure may be warranted.[9]

---

**9.** This Circuit has explicitly recognized inadequacy resulting from a consolidated sentencing as a basis for an upward departure. *See United States v. Bauers*, 47 F.3d 535, 538 (2d Cir.1995). Another Circuit has gone so far as to call this an "encouraged" basis for a departure. *See United States v. Connelly*, 156 F.3d 978, 983–84 (9th Cir.1998).

I have determined that a 1–level increase in Criminal History Category is warranted here. This is exactly the type of case described by the Guidelines. Mr. Maurer engaged in three different fraudulent schemes over a 4–year period of time. He stole well over half a million dollars. His criminal conduct increased in severity from scheme to scheme. A criminal history category at the lowest level simply does not reflect the totality of this defendant's criminal conduct. The Government argues, in the alternative, that the enhancement is also warranted based on prior similar adult criminal conduct that has not resulted in convictions. This is also a recognized ground for departure. *See United States v. Kim,* 896 F.2d 678, 682 (2d Cir. 1990). As an alternative basis for imposing this enhancement, I find that the defendant engaged in a good deal of criminal conduct for which he has never been charged—including false statements in two bankruptcy petitions, a false statement in an affidavit submitted to a bankruptcy court, and a false notary of a signature where he knew that the person who allegedly signed the document had been dead for three years. Accordingly, defendant's Criminal History Category is upwardly adjusted to Category II.

## B. Family Circumstances

■ Defendant has moved for a downward departure based on what he asserts are extraordinary family circumstances. In particular, he cites his mother's mental and physical conditions, his wife's mental condition and his concerns for his two young children. While this Circuit has recognized this ground for departure, it has only been warranted where it is clearly established that the defendant is a unique source of financial and/or emotional support for a significant number of dependents. *See, e.g., United States v. Faria,* 161 F.3d 761, 762 (2d Cir.1998) ("we have upheld downward departures based on family circumstances 'where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments.'") (quoting *United States v. Sprei,* 145 F.3d 528, 535 (2d Cir.1998)); *United States v. Galante,* 111 F.3d 1029, 1037 (2d Cir.1997). Here, the defendant has failed to demonstrate that he is the sole source of such support.

To the contrary, defendant falls in the large class of defendants where "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. The fact that defendant has strong and close ties with his mother, his wife and his children should be considered in determining where within the guideline range to sentence the defendant, but is not the basis for a departure. This defendant is surely not the sole financial support of his family. For the past two years, when he was with his family, it seems that he contributed little or no financial support to his family. His wife works and earns a significant salary. In addition, there is a good deal of family support including a brother-in-law with significant financial resources who has helped out before and hopefully will do so again. The same can be said for emotional support. Mrs. Maurer is capable of caring for her children. In addition, there are parents, grandparents, aunts and uncles, siblings, and in-laws who should be able to assist her and provide adequate emotional support. It simply cannot be said that Mr. Maurer provides the sole financial or emotional support for his family. The motion for a downward departure on this basis is denied.

### The Sentence

■ Offense level 19 in Criminal History Category II produces a sentencing guideline range of 33–41 months in custody. The defendant is sentenced to the lowest end of the Guideline range, 33 months in custody, for a number of reasons. First, he has proved to be a model prisoner for the time in which he has been incarcerated. Second, his remarks to the Court at sentencing demonstrated genuine

remorse for his actions. Finally, although they do not warrant a departure, his family circumstances should be taken into account in determining the appropriate sentence within the guideline range. For these reasons, defendant is sentenced to 33 months in custody.

 Defendant is also ordered to make restitution. Because defendant was convicted after April 24, 1996 for an offense against property under Title 18 of the United States Code and because there was an identifiable victim who suffered a pecuniary loss, restitution is mandatory under 18 U.S.C. § 3663A. Because restitution is mandatory, factors such as defendant's ability to pay need not be considered before imposing the full amount of restitution. On Indictment 98 CR 1452, defendant is ordered to pay restitution in the amounts of $12,600 and $4,913.56 to Fleet Bank and Chase Manhattan Bank, respectively. On Indictment 98 CR 852, restitution in the amount of $10,486 shall be paid to the Social Security Administration. Restitution must also be made to Interim, the amount of which shall be determined at a later date. Restitution shall be made at the rate of 10% of defendant's gross monthly earnings to commence thirty days after his release from custody. Any amount remaining after the term of supervision has expired is collectible by the Government for 20 years after defendant's imprisonment pursuant to 18 U.S.C. §§ 3664(m)(1)(A) and 3613(b). A $350 special assessment is also imposed.