UNITED STATES,

v.

Bernard JAFFE, Jr. Defendant.

No. 02 CR.1091(AKH).

United States District Court,
S.D. New York.

March 30, 2004.

Lawrence S. Goldman, Goldman & Hafetz, New York, NY, Walter S. Jr. Mack, Doar Rieck & Mack, New York, NY, for defendant.

### *OPINION AND RULINGS ON SENTENCING: FAMILY CIRCUMSTANCES; ACCEPTANCE OF RESPONSIBILITY; AND RESTITUTION*

HELLERSTEIN, District Judge.

Bernard Jaffe, Jr. pleaded guilty on May 2, 2003 to violating 18 U.S.C. § 1014, by knowingly making false statements to influence the lending determinations of an FDIC-insured bank. As a direct result of his fraud, Jaffe obtained a $20 million line of credit from the Bank of New York, and became indebted to it in the amount of $20,342,562.13, including interest. I conducted sentencing hearings on October 24 and December 5, 2003, and February 3, 2004, and sentenced defendant to fifty-seven months imprisonment, three years of supervised release, and restitution of $18,154,242.77 plus interest, payable according to a schedule of lump-sum and percentage of gross income payments. I write to discuss the principle sentencing issues: denying his motion for downward departure because of the alleged needs and dependency of his 43–year old daughter; finding sufficient acceptance of responsibility despite reservations· arising from his resistance to full disclosure of assets and to making restitution; and fixing the scope and extent of required payments in the context of a mix of defendant's assets and income, and the claimed applicability of Florida's homestead, and federal and state pension, exemptions.

*Background*

Bernard Jaffe, Jr. is seventy-three years old. He had a wealthy, but unloving childhood, had a college education, and honorably served our country as a first lieutenant in Korea towards the end of the Korean War. He was twice married, once widowed and once divorced, with a child from each marriage: Brenda, now forty-three and single, and Anthony, now forty and married. Brenda lives close to Jaffe, in Delray Beach, Florida, and is said to be dependent on him, as discussed below. Anthony lives in Los Angeles, California.

Jaffe worked as a stockbroker, beginning as a trainee with a salary of $55 per week, and ending as a partner of a large firm, successful in securities and commodities investments and trading, for himself and for his customers. He retired as a Senior Vice President of his stockbrokerage company on January 18, 2002, when his offenses came to light.

Each year from 1986 to 2000, Jaffe obtained an unsecured line of credit from the Bank of New York (BNY). The size of this loan grew from $300,000 in 1986 to approximately $20 million in 2000. Each year, he "cleaned up" his line of credit by repaying BNY and not borrowing from it for a thirty-day period (although it appears that he borrowed from another bank in the

interim, both to help clean up his BNY indebtedness and for general purposes). Each year's loan was induced by a current personal financial statement.

Beginning several years before his extensive frauds were discovered, Jaffe presented ·false and fraudulent financial statements, overstating his assets and understating his liabilities, each year in increasingly larger amounts. In the summer of 2000, as in previous years, Jaffe cleaned up his line of credit, paying it, as in prior years, with substantial help from a short-term loan from a different bank, Chase Manhattan Bank. By 2000, he represented that his net worth had increased to become $171 million, a sum which was two orders of magnitude greater than Jaffe's actual net worth. Jaffe thereby induced BNY to extend a $20 million line of credit to him for the year beginning August 24, 2000 and ending August 31, 2001. Jaffe drew upon the entire line, but was unable to repay it at maturity. The decline of the stock market during 2000 and 2001 dried up his credit and was too large to bridge, and Jaffe defaulted. BNY extended maturity to January 15, 2002, but still Jaffe could not repay. Jaffe then disclosed that he did not own over $162 million of the assets he had claimed to have, and asked for five years to repay. The Bank, however, having become suspicious of Jaffe's integrity, launched a private, and then instigated a criminal, investigation, which found a massive fraud on Jaffe's part. On May 2, 2003, Jaffe pled guilty to an Information which charged him with violating 18 U.S.C. §. 1014, for knowingly making false statements on a loan application to influence the action of an FDIC-insured bank.

Jaffe's plea agreement stipulated to an offense level of 27, less a three-level reduction for timely acceptance of responsibility, yielding a net offense level of 24. *See* U.S. Sentencing Guidelines Manual (U.S.S.G.) § 3E1.1 (Nov. 1, 2000). That net offense level, in the absence of any previous criminal history, produced a range of imprisonment of 51 to 63 months. The plea agreement left Jaffe with one ground to move for departure: extraordinary family circumstances related to his daughter, Brenda Jaffe. The government reserved the right to object.

Jaffe's use and application of the money he had fraudulently procured over the years could not be adequately traced. Large portions of it were given to Jaffe's daughter and son, and to a female companion; other portions increased Jaffe's exempt assets, including a sumptuous residential property in Florida and his "401–K;" and still other portions were spent on a high style of living, which included leases of two luxury cars, memberships in two country clubs, dinners at pricey restaurants, trips with his companion to New York for shopping and stays at luxury hotels, and the like. Some of it went to repay the prior year's bridge loan from Chase Manhattan Bank. Another large chunk, according to Jaffe, was lost in the stock market. In all, BNY could find only $10 million, and could recover only $5 million, against its $20 million outstanding indebtedness and accumulated interest.

Despite protests to the contrary, Jaffe cooperated very little in BNY's investigation, forcing it to engage in expensive discovery and turn-over proceedings, in New York and Florida state courts. It took a warning from me—that Jaffe was jeopardizing my ability to find that he would be entitled to a sentencing credit for acceptance of responsibility—before he opened his records to BNY sufficiently to allow it to gain some confidence concerning Jaffe's financial condition. Even now, it appears that Jaffe is unable to account for material amounts of the funds he had fraudulent procured.

*Extraordinary Family Circumstances*

██ Jaffe moved for a downward departure based on extraordinary family circumstances, pursuant to U.S.S.G. § 5H1.6. Jaffe asks that his jail time be reduced, and his restitution obligations qualified, to enable him to care for his 43–year–old daughter, Brenda. Brenda is single and lives near her father in Delray Beach, Florida.

According to the materials submitted by Jaffe, Brenda suffers from depression and anxiety disorders, stemming from the death of her mother when she was two years old and the divorce of her father and step-mother when she was twelve, and first emerging when she was seven. Brenda is currently recovering from breast cancer after surgery and radiation. According to Jaffe, she refuses to take her medications or attend to medical appointments concerning a possible recurrence of cancer, yet she worries obsessively over her condition. Jaffe states that she calls him constantly, at all hours of day and night, and is helpless without him. According to Jaffe, she has never held a full-time or permanent job. Her younger half-brother Anthony, forty years old, lives in California with his own family, and cannot be expected to displace his father's role, even though he may wish to do so. On the other hand, Brenda works part-time and lives alone. Although Jaffe claims that she relies upon her father for financial support, that appears to be as much owing to their high style of living as to any reasonable necessity.

"Family ties and responsibilities ... are not ordinarily relevant" in determining whether a sentence should be reduced on grounds of departure. U.S.S.G. § 5H1.6 (Policy Statement). The grounds for departure from the applicable guideline range must be "extraordinary," *United States v. Walker,* 191 F.3d 326, 338 (2d Cir.1999), particularly when the dependent is an adult. Thus, in *United States v. Brechner,* a departure was granted because the 37–year–old claimed dependent not only suffered from drug and emotional problems, but also had four times attempted suicide and could not be released from her hospitalization unless she was placed in her father's care. The sentence was later vacated on other grounds. *U.S. v. Brechner,* 99 F.3d 96 (2d Cir.1996), *vacating* 1995 WL 804580 (E.D.N.Y. Oct.15, 1995).

In other cases, departures were granted because defendants had to care for spouses suffering from extraordinary illnesses or parents who were frail and elderly. For example, in *United States v. Alba,* 933 F.2d 1117 (2d Cir.1991), a departure was granted to a defendant who worked at two jobs to support his wife, two children, grandmother, and a disabled father who depended on the defendant's physical strength to help him get in and out of his wheelchair. As the Court of Appeals ruled in *United States v. Johnson,* 964 F.2d 124 (2d Cir.1992), in affirming a departure where the defendant was the sole parental figure for three minor children, including one infant and one institutionalized child, and a baby grandchild, departure is appropriate only where necessary to avoid "wreak[ing] extraordinary destruction on dependents." *Id.* at 129. "Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration," *id.* at 128, and have already been presumptively considered by the Sentencing Commission when it drew up the Guidelines. *See also United States v. Madrigal,* 331 F.3d 258, 260 (2d Cir. 2003) (departure reversed; only one of defendant's six children under age eighteen, and other caretakers available); *United States v. Faria,* 161 F.3d 761, 763 (2d Cir.1998) (departure reversed; ex-wife available for minor children); *United*

*States v. Sprei,* 145 F.3d 528, 535 (2d Cir.1998) (departure reversed; family not uniquely dependent on defendant).

Brenda Jaffe, despite her alleged mental fragility, is not a minor child, and is not uniquely dependent on her father for support. She is a well-educated adult woman, who lives on her own and has successfully worked part-time at various jobs. Having worked part-time, she can again find suitable work to sustain herself, perhaps not in the lavish style that her father provided her from fraudulently procured funds, but in an adequate style common to most people.

*Acceptance of Responsibility*

The crime to which Bernard Jaffe, Jr. pleaded, adjusted for the amount of money he fraudulently procured, is punishable by imprisonment of 70 to 87 months. U.S.S.G. § 2F1.1. By pleading guilty and accepting responsibility for his offense, he potentially became entitled to a downward adjustment of two levels, and an additional level for timeliness, thereby reducing the sentencing range to which he was subject to 51 to 63 months. But Jaffe had to "clearly demonstrate[ ]" his acceptance of responsibility, *id.* § 3E1.1(a), and his conduct with regard to making restitution to the victim of his fraud created substantial doubt that he was eligible for the adjustment he sought. As Jaffe was seventy-three years of age, the issue assumed great importance.

█ Jaffe's allocution at the time of his plea was entirely satisfactory. But his conduct was quite something else. Jaffe's words were eloquent: "I accept responsibility. I am very embarrassed by what I did. I was under strain. I should never have done it." But he engaged in every artifice that he and his counsel could concoct to hold onto his fraudulently procured funds and frustrate his victim, The Bank of New York, seeking to mitigate his own culpability by blaming the Bank for lend-ing selfishly and carelessly. He refused to give a full and fair accounting, became involved in acrimonious litigation in the state courts of Florida and New York, zealously cloaked his fraudulently procured funds in state and federal exemptions, liberally showered gifts upon his two children and companion and encouraged them to resist any return of those gifts, and lived and traveled lavishly all the while.

A three-level adjustment does not follow automatically from a guilty plea. The eloquence of a defendant does not suffice, for it is his conduct that must be judged. As the Application Notes make clear, "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable," is but one of several factors to be considered. U.S.S.G. § 3E1.1, App. Note 3. The court must also inquire if the defendant, among other things, has shown a "voluntary payment of restitution prior to adjudication of guilt." *Id.* As Application Note 3 provides:

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable ... will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.

█ The issue of a defendant's acceptance of responsibility, and his entitlement to the three-level downward adjustment authorized by the Sentencing Guidelines, must be considered by the sentencing

judge, evaluating all relevant facts and exercising wise discretion. *Id.* App. Note 5; *United States v. Guzman,* 282 F.3d 177, 184 (2d Cir.2002) (sentencing judge has discretion in making this "factual determination"); *see also United States v. Fisher,* 38 Fed. Appx. 39, 42 (2d Cir.2002) (same); *United States v. Ortiz,* 218 F.3d 107, 109 (2d Cir.2000) (same); *United States v. Goodman,* 165 F.3d 169, 175 (2d Cir.1999) (same). Thus, in *Fisher,* a case of tax, mail and bankruptcy fraud, the Court of Appeals affirmed Judge Amon's finding that defendant was not entitled to the downward adjustment, for his "acceptance of responsibility ... was not clear," was equivocating, "guarded," and "disingenuous." 38 Fed. Appx. at 41. Similarly, in *United States v. Zichettello,* 208 F.3d 72 (2d Cir.2000), Judge Batts denied the three-point adjustment—and the Second Circuit affirmed—where defendant reneged on his promise to pay restitution from funds available to him for that purpose. *See also United States v. Harris,* 38 F.3d 95, 98–99 (2d Cir.1994) (no adjustment; failure to pay promised restitution and attempted bribery of witnesses).[1]

Several cases have suggested that the determination of acceptance of responsibility, far from being a legal checklist or formalistic determination, imports into the law a moral concept. *See, e.g., Mitchell v. United States,* 526 U.S. 314, 330, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (linking "the determination of a lack of remorse" with that of "acceptance of responsibility for

purposes of the downward adjustment provided in § 3E1.1"). In *United States v. Hernandez–Fundora,* 58 F.3d 802, 813 (2d Cir.1995), the Second Circuit quoted with approval Judge McAvoy's statement that "[a]cceptance of responsibility entails more than just admitting that certain conduct was committed. It also entails the concept that that conduct was wrong, violative of the law and that the individual accept the idea that he now has to be punished for it." *United States v. Reyes,* 9 F.3d 275, 280 (2d Cir.1993), approved of an inquiry into the defendant's "remorse or contrition." *Zichettello* cited to *United States v. Wells,* 154 F.3d 412 (7th Cir.1998), where Judge Posner discussed the concept of acceptance of responsibility:

> The purpose of the acceptance of responsibility discount is not only to induce guilty pleas, but also to identify defendants who, having demonstrated sincere remorse for their crime, are less likely either to delay the course of justice or to engage in further criminal activity when they complete their sentence. [Collecting sources.] Talk is cheap, and so *Beserra* emphasizes that acceptance of responsibility is to be inferred from deeds, not from weepy mea culpas at sentencing.... The remorseful or repentant criminal would want to do everything possible to rectify the harmful consequences of his crime, and so if he still has any of the loot he will return it....

---

**1.** I also may not grant a partial adjustment based on partial acceptance of responsibility. Section 3E1.1, by requiring a "clear[ ]" demonstration of acceptance of responsibility, seems to be inconsistent with a partial credit for partial acceptance, for a partial acceptance cannot be a "clear[ ]" demonstration. U.S.S.G. § 3E1.1, App. Note 1. *But see United States v. Maurer,* 76 F.Supp.2d 353 (S.D.N.Y. 1999). *United States v. Brown,* 316 F.3d 1151 (10th Cir.2003), criticized *Maurer* and the

concept of a partial reduction, and collected cases from five other circuits which held the same. The Second Circuit has also held in *United States v. Rood,* 281 F.3d 353 (2d Cir. 2002), that if the conditions of § 3E1.1(b) are met, its application is automatic. Therefore, Mr. Jaffe, like all criminal defendants for whom subsection (b) is applicable, was entitled to either zero or three points' reduction of his sentence, and I had no discretion to award a middle ground.

If authority is needed for what strikes us as a self-evident proposition, it can be found in Claudius's prayer soliloquy in Hamlet (Act III, sc. 3, ll. 36–72). By murdering Hamlet's father, the king of Denmark, Claudius had become king and also had married the king's widow. He is frank in acknowledging his crimes. "O, my offense is rank! It smells to heaven." He tries to pray for forgiveness, but realizes that this is impossible because

> ... what form of prayer Can serve my turn? "Forgive me my foul murder"? That cannot be, since I am still possessed Of those effects for which I did the murder: My crown, mine own ambition, and my queen. May one be pardoned and retain the offense?

*Id.* at 413–14 (citations omitted), cited in *Zichettello,* 208 F.3d at 107.

To the extent that the term "acceptance of responsibility" seeks to import a moral concept into the law, civilized society long before Shakespeare concluded that genuine acceptance of responsibility encompasses not simply an eloquent statement, but a recognition of the wrong committed, a resolve never to repeat it, and an attempt to ameliorate its effects to the extent possible. Leviticus 5:20–26 provides that one who wrongfully takes property of another, by theft or by fraud, cannot gain absolution unless he first restores to his victim all that he took, and a fifth more; only then is he eligible to gain absolution. As early as 397 C.E., Augustine understood that a mere recitation of the lips may not suffice to constitute a true confession: "O Lord, the depths of man's conscience lie bare before your eyes.... I make my confession, not in words and sounds made by the tongue alone, but with the voice of my soul and in my thoughts which cry aloud to you." Saint Augustine, *Confessions,* Book X:2, at 207 (R.S. Pine–Coffin trans., Penguin Books 1961).

Maimonides, almost eight centuries later, in approximately 1185, also prescribed that remorse must be demonstrated through actions and not only through words: "What is repentance? It is when the sinner abandons his sin and removes it from his thoughts, and resolves in his heart that he will no longer commit it." Maimonides, *Laws of Repentance* 2:2 (Eshkol ed.1986). Repentance requires the wrongdoer to "change his ways entirely toward good," and, Maimonides concludes, "we do not forgive him until he repays his fellow what he owes to him and appeases him." *Id.* at 2:4, 9.

The requirement of true remorse for prior wrongdoing is as fundamental today as it was centuries earlier. *See, e.g.,* Editorial, *A Lame Confession from Pete Rose,* N.Y. Times, Jan. 7, 2004, at A20 (opining that "there is not a lot of redemption visible here" because Pete Rose did not "show much contrition"). Fay Vincent, the former Commissioner of Major League Baseball, made the point eloquently:

> Ever since St. Augustine set the bar pretty high, there has been a certain style to confessional tomes. Now we have a mea culpa by Mr. Rose and no saint is he. Augustine, having lived it up, saw the light and wrote with a sense of guilt and regret. He even anguished over having stolen a pear. Early reports are that Mr. Rose confronts his past with very little remorse. Between him and Augustine, there is little doubt whose book will live longer.

Fay Vincent, Op–Ed, *The Confessions of Pete Rose,* N.Y. Times, Jan. 2, 2004, at A17.

Thus, § 3E1.1 requires that acceptance of responsibility be shown "clearly," *id.,* and the Application Notes direct that an evaluation consider such factors as a truthful admission, voluntary termination of criminal conduct, and voluntary payment

of restitution. *Id.* App. Note 1. Acceptance of responsibility is a matter of the full persona—the head and heart, as well as the lips.

Jaffe's conduct, at and prior to the sentencing hearing of October 24, 2003 left me entirely unconvinced that he had "clearly" accepted responsibility for his actions. At my invitation and his request, I deferred any finding on this issue for another six weeks, until an adjourned sentencing hearing to be held December 5, 2003.

Jaffe used the interval constructively. He gave useful disclosure of his financial condition to the Probation Department and to the Bank of New York, and substantially dispelled the Bank's suspicion that he was hiding assets and was unduly obstructive. The Bank reported that the gap between it and Jaffe had been narrowed in tracing the income and assets that Jaffe had enlarged by fraudulently obtained loan proceeds. Tr. Dec. 5, 2003, at 8. The Bank's issue "ultimately [came] down to . . . dollars and cents," *id.;* but I still had to determine whether Jaffe clearly had demonstrated that he accepted responsibility for his crime. I found, with some lingering reservation, that Jaffe made that showing.

*Restitution*

### 1. The Statutory Scheme

Under the Mandatory Victim Restitution Act of 1996, "the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). Restitution is mandatory for all offenses against property, "in the full amount of each victim's losses as determined by the court." *Id.* §§ 3663A(c)(1)(A)(ii); 3664(f)(1)(A); *see also id.* § 3663(a)(1)(A). Defendant's circumstances are not to be considered, except in fashioning an order as to the manner in which restitution is to be paid. *Id.* § 3664(f)(1)(A). The factors provided by statute to be considered in fashioning such an order are as follows:

> "Upon determination of the amount of restitution owed to each victim, the court shall . . . specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of -
>
> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant; including obligations to dependents."

*Id.* § 3664(f)(2).

The restitution order may require "a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." *Id.* § 3664(f)(3)(A). The sentencing judge is given continuing jurisdiction to amend or adjust the restitution order to consider "material change[s] in the defendant's economic circumstances." *Id.* § 3664(k), (o). At the end of the period of supervised release, upon request of the victim, an abstract of judgment may be issued, which "shall be a lien on the property of the defendant." *Id.* § 3664(m)(1)(B).

The Sentencing Guidelines incorporate the statutory provisions. U.S.S.G. § 5E1.1(a), (e).

### 2. Total Restitution and Rate of Interest

██ The parties have reached agreement on the net principal amount for Jaffe's order of restitution: $15,639,008.26, reflecting the Bank's total loss of $20,342,562.13, less sums thus far recouped. I rule that interest shall run on the Bank's net loss at the rate of nine per

cent per annum from the date of loss to the date of sentence, December 5, 2003, yielding $18,154,242.77, and at the same rate thereafter. Jaffe objects to a nine percent rate, both pre- and post-judgment.

Federal law does not provide an interest rate for orders of restitution. Were restitution to be considered a fine, Jaffe would have had to pay two percent per annum. *See* 18 U.S.C. § 3612(f).[2] Restitution, however, is intended to return to the victim that which was wrongfully wrested from him and, since he was deprived of the use and benefit of his funds, restitution should reflect that loss as well. Accordingly, the statutory interest rate used for civil judgments in both federal and state courts in this district provides a more suitable remedial base, that is, nine percent. *See* N.Y. C.P.L.R. § 5004.

I should not assume that the omission from 18 U.S.C. § 3612(f) of an interest rate applicable to orders of restitution was accidental. Although *expresio unius est exclusio alterius* is a canon of construction rather than a rule of law, *see* William N. Eskridge, Jr., et al., *Legislation* 824–25 (3d ed.2001); Kent Greenawalt, *Legislation* 202–05 (1999), the sound policy to favor remediation of loss argues for an interest rate different from that prescribed for fines. Federal courts have regularly turned to state law to fill in statutory gaps, consistent with the federal policy to be served. *See generally Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Federal courts have applied this holding to interest rates. *See, e.g., Baltimore & Ohio Railroad Co. v. United States,* 279 U.S. 781, 786, 49 S.Ct. 492, 73 L.Ed. 954 (1929) (setting interest "at the rate established by the law of the State in which such sums were paid"); *Memorial*

*Drive Consultants, Inc. v. ONY, Inc.,* 29 Fed.Appx. 56, 63 (2d Cir.2002) ("we hold that the district court was correct to apply New York's nine-percent pre-judgment interest rule, under N.Y. C.P.L.R. 5004"); *Amoco Transport Co. v. Dietze, Inc.,* 582 F.Supp. 804, 808 (S.D.N.Y.1984) ("In a diversity action, the rate of interest to be applied is that specified under the law of the state where the federal court is sitting. In New York, the specified legal rate of interest is nine percent per annum. N.Y. Civ. Prac. Law § 5004."). A nine percent interest rate is standard for both pre-and post-judgment payments in the Southern District of New York, for all kinds of commercial cases, including cases requiring restitution, that is, restoring loss to the aggrieved party. Just as a nine percent interest rate is part of the remediation to which a civil aggrieved is entitled, so it should be applied to restitution awarded as part of a criminal judgment.

Unlike most civil judgments, the Sentencing Guidelines give me discretion with regard to orders of restitution. U.S.S.G. § 5E1.1(e). But Jaffe has shown nothing to cause me to choose a lower interest rate. The hardships Jaffe cites have to do with providing for himself after he leaves jail and maintaining a "comfortable" style of life for his daughter. These considerations do not balance against the policy to provide remediation to the victim of Jaffe's fraud. One might also argue that nine percent is higher than current rates paid by banks on savings accounts and mutual funds on liquid asset investments, but Jaffe's creditworthiness hardly equates to that of banks or mutual funds. If adjustments should equitably be made in the context of future hardships, I am given continuous jurisdiction to make such adjustments as might be appropriate in light

2. The caption of the section reads "Fines and Restitutions," but the statute provides an interest rate computation applicable only to fines.

of future considerations. 18 U.S.C. § 3664(k), (o).

Accordingly, I hold that a nine percent interest rate is appropriate, and I order that Jaffe pay restitution in the sum of $18,154,242.77, reflecting principal and accrued interest to December 5, 2003, and interest at nine percent thereafter.

3. Restitution Schedule

The "manner" of Jaffe's restitution obligation to the Bank, that is, the mix of lump-sum and regular payments to be ordered, must take into consideration Jaffe's "financial resources and other assets," his "projected earnings and other income," and "any financial obligations . . ., including obligations to dependents." 18 U.S.C. § 3664(f)(2). I discuss the last consideration first, Jaffe's obligations to others, including "dependents."

Jaffe argues that he has an obligation to support his daughter, Brenda, and that this obligation should be considered in fixing his restitution payment schedule. However, as I discussed in denying Jaffe's motion for downward departure, Brenda is not a dependent, and Jaffe owes her no financial obligation, legal or moral, to prefer her over the victim of his fraud. Brenda is a 43-year old adult, who has been living independently, without objective evidence that she is in need of continuing financial assistance to remain independent. There has been no determination, judicial or otherwise, that she is a mental incompetent, that she retains the status of a dependent, or that her father is obligated to support her. Jaffe's desire to continue to funnel proceeds gained from his frauds to his family does not constitute a "financial obligation[ ] . . . to dependents" which should be considered, under 18 U.S.C. § 3664(f)(2)(C), in fashioning a restitution payment schedule to the victim of his fraud.

In considering Jaffe's "financial resources and other assets" and his "projected earnings and other income," the statute directs me to the Presentence Investigation Report prepared by the probation officer. *See id.* § 3664(a), (d). The Presentence Investigation Report sets out, as of October 24, 2003, a summary of Jaffe's financial condition as Jaffe represented it to the probation officer:

1. Cash on hand totaling $20,417.00;

2. Individual Retirement Account and other accounts totaling $2,122,188.00;

3. A Florida condominium valued at $1.3 million (presumably, at the lower of cost or market value); and

4. A car valued at $15,680.00.

Jaffe's total acknowledged net worth is $3,457,985. Jaffe also represents that he receives monthly income of $17,934 from Social Security, his IRA, and other distributions, or $215,208 per year. Under 26 C.F.R. § 1.401(a)(9)–5 and (a)(9)–9, Jaffe is required to withdraw, at a minimum, nearly $80,000 annually from his IRA alone. I take note, also, that Jaffe's asset values mainly consist of marketable securities valued at a historically low point in time and a prime Southern Florida residential property, and that such values are likely to rise over time. BNY alleges, as well, based on Jaffe's inability or unwillingness to account for all proceeds he obtained from his fraudulently induced loans, that there are hidden assets. Jaffe also has made substantial transfers of funds to his daughter, son, and companion, and may be able to obtain transfers back to him if he is unable to make timely restitution payments pursuant to my order without selling assets. He cannot complain if the transfers have left him without sufficient funds short of invading other assets as to which he might claim an exemption.

Bearing all this in mind, and my duty to fashion a proper restitution order pursuant to 18 U.S.C. § 3664(f)(2), I ordered at sentencing that Jaffe pay restitution according to the following schedule:

(1) $100,000 by March 19, 2004; [3]

(2) $1.5 million by January 31, 2005; and

(3) Installments of the greater of $150,000 or fifteen percent of Jaffe's post-tax annual net income, by January 31, 2005, and every successive January 31 thereafter.

My rationale for this schedule was as follows. Jaffe's cash on hand, the value of his car (which he will not need in jail), and monthly income are available sources for the first payment due earlier this month, forty-five days after I pronounced his sentence. If Jaffe needs additional sums, they are available to him from his IRAs as distributions to a person over 70½ years of age. Jaffe's victim, BNY, is entitled to a prompt beginning on the restitution due to it, particularly after Jaffe's aggressive campaign to postpone his day of reckoning.

Jaffe's second payment, due a year from sentencing, by January 31, 2005, will require him to save from his monthly income, draw as much as he can from available sources, perhaps gather funds which he earlier transferred to his companion, son or daughter, or perhaps liquidate assets. Jaffe argues that he will certainly have to sell his Florida condominium, even though Florida's homestead exemption prevents creditors from distraining residential properties, however lavish. Fla. Const. Art. X, § 4(a). But that is not my order. While he may determine that he will satisfy his restitution obligations by selling his homestead, I do not require that, and instead I leave him free to choose his manner of making restitution. *See United States v. Kalani,* 2003 WL 21222546, 2003 U.S. Dist. Lexis 8762 (S.D.N.Y. May 23, 2003) (holding that a lump-sum restitution order is valid where it does not specify the source of the restitution or direct liquidation of specific assets and the defendant may have other sources of payment).

Jaffe argues that he will have no choice but to sell his Florida condominium, and that the restitution order would therefore circumvent the enforcement provisions of the Mandatory Victim Restitution Act (MVRA) and contradict a protection granted to persons in his status by the Constitution of the State of Florida. Fla. Const. Art. X, § 4(a); *see United States v. Lampien,* 89 F.3d 1316, 1322 (7th Cir.1996) (restitution order vacated because it required sale of a specific asset). In *Lampien,* the district court ordered the defendant to execute a quitclaim deed to her homestead. The Court of Appeals reversed, holding that such an order would circumvent the detailed enforcement provisions of the Victim and Witness Protection Act (VWPA), the predecessor to the MVRA, and the VWPA did not authorize the enforcement mechanism adopted by the district court. My order, in contrast, does not require Jaffe to sell or transfer any specific property. Furthermore, *Lampien* has not been adopted by the Second Circuit and is uncertain law even within its own circuit. *See United States v. Hoover,* 175 F.3d 564, 569 (7th Cir.1999) (rule of *Lampien* superceded by MVRA, providing that restitution be paid to specific victims). Jaffe's order of restitution did

---

**3.** At the sentencing session held on February 3, 2003, I ordered that the first restitution payment be made within thirty days of that date, by March 4, 2004. In response to Jaffe's letter of March 2, 2004, the judgment which I entered on March 5, 2004 enlarged the time by fifteen days, until March 19, 2004. Jaffe's counsel has advised me that this payment was made on March 19, 2004.

not explicitly require sale of a particular asset; the manner by which he makes restitution was fixed pursuant to the statutory factors provided by 18 U.S.C. § 3664(f)(2). Jaffe's argument is wrong on the facts and on the law.

Jaffe has several available sources from which to pay the required restitution. These include distributions from pensions and IRAs that are available to persons his age, transfers back of funds that he gave to his companion, son, and daughter, sales of assets, and such other assets as might not yet have been disclosed to BNY. Quite possibly, however, once all liquid assets are spent, the next available asset might be Jaffe's home. If that is the case, Florida homestead law will not protect him with respect to his duty to provide restitution to his victim. It is significant that the Court of Appeals for the Eleventh Circuit, the Court of Appeals most familiar with Florida's laws and Constitution, has held that under the Supremacy Clause, U.S. Const. Art. VI, § 1, cl. 2., Florida's homestead exemption cannot apply against contrary federal law. *See United States v. 817 N.E. 29th Drive, Wilton Manors, Florida,* 175 F.3d 1304, 1311 n. 14 (11th Cir.1999) (federal forfeiture statute covers Florida homestead); *United States v. 3262 Southwest 141 Ave.,* 33 F.3d 1299, 1301 n. 6 (11th Cir.1994) (same); *United States v. Lot 5, Fox Grove, Alachua County, Florida,* 23 F.3d 359, 363 (11th Cir.1994) (same); *United States v. 18755 North Bay Road,* 13 F.3d 1493, 1498 (11th Cir.1994) (same). 18 U.S.C. § 3613(a) provides that restitution may be enforced against *all* property, save certain enumerated exemptions, and these exemptions do not include a defendant's home.

Jaffe argues, similarly, that yearly restitution obligations of the greater of $150,000 or 15 percent of his net income after taxes, beginning by January 31, 2005, almost a year after sentencing, will require him to liquidate pension assets that creditors cannot distrain under federal and state law. Jaffe argues that his net annual income after taxes will be approximately $139,000, not enough to make the required payments and leaving nothing for his personal needs.

Jaffe has represented that his annual income from all sources is $215,208. I am not in a position to calculate the deductions that he may have against this income. To the extent that his monthly income will not be sufficient to discharge his restitution obligation, he can draw upon the variety of assets and income he has at his disposal. His living expenses during his imprisonment will be minimal, leaving the bulk of the funds available to him each year as sources to draw upon in order to discharge his yearly obligation to make restitution to his victim. *See United States v. Corbett,* 357 F.3d 194, 195 (2d Cir.2004) (affirming restitution order of "75 % of the household cash flow" as complying with 18 USC § 3664(f)(2), but remanding for clarification of "cash flow").

Jaffe also argues that if BNY prevails in its civil litigation, he will have no money left with which to satisfy the restitution order, leaving him and his daughter indigent. The contention is specious. If BNY recovers, and Jaffe is forced to pay more than the restitution order requires, he can apply for relief. As sentencing judge, I retain jurisdiction to amend or adjust the restitution order, particularly if there arises a "material change in the defendant's economic circumstances." *See* 18 U.S.C. § 3664(k), (o). At this point, the outcome of the civil litigation is speculative, and should not affect an order to make restitution.

■ Jaffe contends that he receives $52,000 annually from his pension plan, and that as a tax-qualified pension plan subject to ERISA, a restitution order re-

quiring payment of his pension would violate the anti-alienation provision of ERISA, 29 U.S.C. § 1056(d)(1). *See Guidry v. Sheet Metal Workers National Pension Fund,* 493 U.S. 365, 376, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (strong federal policy against alienation of pension benefits in order "to safeguard a stream of income for pensioners"); *United States v. Smith,* 47 F.3d 681 (4th Cir.1995) (defendant "cannot be forced to relinquish his ERISA pension benefits for restitution"); *United States v. Jackson,* 229 F.3d 1223 (9th Cir.2000) (same).

However, nothing in Jaffe's restitution order requires him to alienate his pension plan. As I have analyzed his statement of financial condition, he has funds available to him that he can use to discharge his restitution obligations. Furthermore, "ERISA's anti-alienation clause does not apply to pension funds that have already been distributed to the beneficiary." *Jackson,* 229 F.3d at 1225. Pension funds, once distributed, are subject to restitution orders and are not protected by ERISA. *Robbins v. DeBuono,* 218 F.3d 197, 203 (2d Cir.2000) ("this statutory scheme protects benefits only while they are held by the plan administrator and not after they reach the hands of the beneficiary"); *Kalani,* 2003 WL 21222546, *2, 2003 U.S. Dist. Lexis 8762, at *3–*5 (restitution order valid, since the schedule of required payments—lump sum of $60,000 plus 10% of gross monthly earnings—did not specify source of funds to be paid in restitution, or direct liquidation of specific assets, and because defendant had other potential sources of payment); *cf. Lampien,* 89 F.3d at 1322 (restitution order vacated be-

cause it required sale of a single specific asset).[4]

Accordingly, Jaffe has not given any legal, factual or moral argument to avoid the restitution order of his sentence. I order that he comply with its terms.

*Conclusion*

For the reasons stated, defendant Bernard Jaffe, Jr. sufficiently demonstrated timely acceptance of responsibility (although with certain misgivings) entitling him to a downward adjustment of three levels under U.S.S.G. § 3E1.1, but was not entitled to a downward departure on the basis of extraordinary family circumstances under U.S.S.G. § 5H1.6. I sentenced Jaffe to 57 months incarceration, followed by a three-year term of supervised release. As to restitution, I ordered that Jaffe pay BNY, the victim of his fraud, restitution in the net amount of $18,154,242.77, plus interest at the annual rate of 9 percent beginning December 5, 2003, according to the following schedule:

(1) $100,000 by March 19, 2004;

(2) $1.5 million by January 31, 2005; and

(3) Installments of the greater of $150,000 or fifteen percent of Jaffe's post-tax annual net income, by January 31, 2005, and every successive January 31 thereafter.

Other terms of Jaffe's sentence are set out in the judgment filed March 5, 2004.

SO ORDERED.

---

4. The government argues also that the Mandatory Victim Restitution Act trumps the ERISA provision. *Compare* MVRA, 18 U.S.C. § 3612 (*"Notwithstanding any other Federal law* (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property of the person fined," with exceptions not including ERISA (emphasis added)), *with* ERISA, 29 U.S.C. § 1051(6) ("This part shall apply to any employee benefit plan ... *other than* ... an individual retirement account or annuity ..." (emphasis added)).